

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-28-1994

# Dia Navigation Company, Ltd v. Pomeroy, et al.

Precedential or Non-Precedential:

Docket 93-5538

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

## Recommended Citation

"Dia Navigation Company, Ltd v. Pomeroy, et al." (1994). *1994 Decisions.* Paper 63.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/63

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 93-5538


DIA NAVIGATION COMPANY, LIMITED

Appellant

v.

JAMES POMEROY, DISTRICT DIRECTOR IMMIGRATION
AND NATURALIZATION SERVICE; CHRIS SALE,
COMMISSIONER IMMIGRATION AND NATURALIZATION SERVICE;
JANET RENO, ATTORNEY GENERAL DEPARTMENT OF JUSTICE


On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civil Action No. 93-cv-01366)


Argued: March 24, 1994

Before: HUTCHINSON, ROTH and ROSENN, Circuit Judges

(Opinion Filed  June 28, 1994)


Stephen H. Vengrow, Esquire
Joseph F. DeMay, Jr., Esquire (Argued)
Cichanowicz, Callan & Keane
21 West Street, 26th Floor
New York, NY 10006-2908
         Attorney for Appellant

Faith S. Hochberg
United States Attorney

James B. Clark, III,
Assistant United States Attorney
970 Broad Street, Room 502
Newark, NJ 07102
Frank W. Hunger
Assistant Attorney General
Mark C. Walters
Assistant Director
Alexander H. Shapiro, Esquire (Argued)
Office of Immigration Litigation
U.S. Department of Justice
Ben Franklin Station
P.O. Box 878
Washington, D.C 20044
          Attorneys for Appellees


OPINION OF THE COURT


ROTH, Circuit Judge:


        In this case, we are asked to examine the Immigration
and Naturalization Service's ("INS") policy of placing upon
common carriers the burden of detaining stowaways who have
applied for asylum in the United States.  In brief, we conclude
that the provisions of the Immigration and Naturalization Act
("INA") lack the requisite clarity which would justify the policy
as it presently has been established.  In light of the statutory
ambiguity and of the characteristics of the INS policy, we
believe that the policy constitutes a legislative rule which
could only have been promulgated pursuant to the notice and
comment provisions of the Administrative Procedure Act ("APA").
For this reason, we conclude that the District Court improperly

dismissed the appellant's complaint under Fed.R.Civ.P. 12(b)(6). We further find that the district court improperly denied appellant's motion for summary judgment insofar as it sought a judgment declaring that the INS policy on detention of stowaways who have applied for asylum is invalid for failure to comply with the notice and comment procedures of the APA. We do find, however, that the district court properly dismissed appellant's other claims, including its claim for reimbursement of the expenses it incurred in detaining the stowaways involved in this case.[1] We will, therefore, reverse in part and affirm in part the order of the district court and we will remand this case to the district court to enter judgment in favor of appellant consistent with this opinion.

I.

Appellant Dia Navigation Company, Ltd., ("Dia") is a Cyprus corporation which owns the M/V European Senator ("Senator"), an ocean carrier which transports commercial cargo between the United States and Europe. On February 13, 1993, four Romanian stowaways were found aboard the Senator while it was en route from Le Havre, France, to the Port of Newark, New Jersey. The stowaways were presented to and interviewed by an INS inspection officer upon arrival in Newark on February 21, 1992. None of the four Romanians had proper identification for entry into the United States. The INS officer verified that they were

---

[1] Because the stowaways involved in this case have now either been deported or granted asylum, we do not reach appellant's claim for injunctive relief.

in fact stowaways, which meant that they were subject to deportation without an exclusion hearing. However, each of the stowaways requested political asylum.

Under existing INS policy, the carrier on which a stowaway arrives must pay the expenses of detaining him for as long as it takes the INS to process his asylum claim. Accordingly, the INS officer presented the ship's master with a Form I-259 "Notice to Detain, Deport, Remove or Present Aliens." The form provided that "[p]ursuant to the provisions of the Immigration and Nationality Act, and the Regulations issued by the Attorney General thereunder," App. at 25, the aliens were to be detained on board the ship. A notation on the form read: "CARRIER IS RESPONSIBLE FOR THE DETENTION[,] TRANSPORTATION AND WELFARE OF THE ALIEN UNTIL OTHERWISE INSTRUCTED BY USINS." Id. The form was presumably accompanied by some indication by the officer that Dia could detain the stowaways off the ship pending the processing of their asylum claims.

Dia complied with INS's orders, housing the stowaways in two rooms at the Staten Island Holiday Inn and hiring armed guards to maintain one guard per stowaway around the clock.[2] During the detention, one of the detainees began a hunger strike and threatened to commit suicide. To prevent this, the guards placed him in a separate room and put him in leg irons. Faced

---

[2]According to Dia, if it had refused to assume the detention costs, the Senator would have been prevented from entry into or departure from the Port of Newark.

4

with this situation, Dia requested that INS assume custody of this detainee; INS refused to do so.

Furthermore, because INS would not convene a hearing on the asylum claims until it had received completed asylum applications, Dia had to hire a Romanian interpreter to help with preparation of the forms and to assist at the asylum hearings. Ultimately two of the stowaways' asylum requests were granted; the other stowaways were flown back to Romania at Dia's expense.[3] In the end, the Romanians were detained for a total of 54 days. Dia claims to have incurred $127,580 in detention-related expenses.

At this point we pause to note that the processing of asylum applications often takes a considerable amount of time. Indeed, the proceedings in this case appear to have been relatively speedy. Dia cites a General Accounting Office report which indicates that in the period from 1986 to 1989 the average amount of time required to process an asylum application ranged from 5.8 months in San Francisco to 31.2 months in Chicago. General Accounting Office, Report to Congress: Immigration Management 49 (1991). Moreover, our attention has been directed to no set standards, in the form of regulations or otherwise, concerning the conditions under which such aliens are detained. Instead, INS apparently claims the discretion to order whatever measures and impose whatever conditions of detention it deems appropriate. In a hearing before the district court, counsel for

---

[3]Dia does not contest having been required to pay the return travel expenses of the deported stowaways.

INS claimed that INS could require carriers to detain stowaways for any period of time, without limitation. App. at 131-34, 136-38. In response to this assertion, the district court judge inquired: "You can have [an INS officer] who has a bad day and says, I want two guards on this guy 24 hours a day, I want him put in the Plaza, I want him given gourmet meals, and you're telling me that th[e] vessel owner can't say a thing about that, right?" Counsel for the INS simply responded, "Yes." App. at 165.

On March 30, 1993, Dia filed suit under 28 U.S.C. §2201 seeking 1) a declaratory judgment that the INS policy requiring an ocean carrier to both detain stowaways who have applied for political asylum and be responsible for those stowaways' attendant detention costs and expenses was unlawful and void and 2) an injunction to prohibit the INS from enforcing or attempting to enforce the policy. Dia contended that the INS violated the INA, including the User Fee provisions, the APA, and the INS's own regulations. Dia further claimed a right under the APA and the Tucker Act to reimbursement of the expenses it had incurred in detaining the aliens as well as for its related expenses.

Defendants filed their answer to the complaint on May 14, 1993. On May 28, 1993, the government filed a motion to dismiss under Fed.R.Civ.P. 12(b)(6), and Dia filed a motion for summary judgment. On August 11, 1993, the district court granted the government's motion, construing it as a motion for summary judgment, and dismissed the complaint. This appeal followed.

Dia advances a number of arguments on appeal. It contends first that the INA by its terms requires the INS to bear the costs of detaining stowaways who apply for asylum and that this court need not defer to the INS's interpretation of the statute. Dia next asserts that the INS policy violates the INS's own regulations and that the INS's action in this case was arbitrary and capricious. Dia's final attack on the INS policy, and the one with which we agree, is that the policy should have been promulgated pursuant to notice and comment rulemaking. Dia also argues that the district court improperly dismissed its claims for monetary relief.

## II.

The district court had jurisdiction over this case pursuant to 5 U.S.C. § 702, 8 U.S.C. § 1329, and 28 U.S.C. §1331. We have jurisdiction over Dia's timely appeal of the final decision of the district court pursuant to 28 U.S.C. § 1291. Our decision not to consider Dia's claim for injunctive relief, see supra note 1, does not render this appeal moot. We must consider the relevant statutory provisions and their interpretation by INS in addressing Dia's claims for monetary relief. See 13A Charles A. Wright et al., Federal Practice and Procedure § 3533.8 at 378 (1984). Moreover, to the extent that the claims for damages may not support the depth of our analysis, we believe that this case is among those "capable of repetition, yet evading review." In such cases a finding of mootness is avoided by a determination that the complaining party may reasonably expect to be subject to the challenged activity in the future and that the challenged

7

activity is by its nature so short in duration that its validity could not be fully adjudicated prior to its cessation or termination. See Reich v. Local 30, Int'l Brotherhood of Teamsters, 6 F.3d 978, 984 (3d Cir. 1993). See also United States v. Simone, 14 F.3d 833, 836-37 (3d Cir. 1994); Clark v. Brewer, 776 F.2d 226, 229 (8th Cir. 1985); Finberg v. Sullivan, 634 F.2d 50, 55 (3d Cir. 1980) (in banc). Both factors are present here. The international nature of Dia's business makes it quite possible that it will be confronted with the problem of stowaways in the future. And the amount of time required to process asylum applications, while lengthy, is typically less than would be necessary to adjudicate the validity of the INS policy. Cf. ITT Rayonier v. United States, 651 F.2d 343, 346 (5th Cir. Unit B July 1981) ("We would be most reluctant to permit a federal agency to so arrange its timetables that the scope of its authority would continue to elude judicial scrutiny.").

Because this case concerns the district court's grant of summary judgment, we have plenary review. E.g., Erie Telecommunications, Inc. v. City of Erie, 853 F.2d 1084, 1093 (3d Cir. 1988).

### III.

Under the INA, all aliens arriving in the United States are subject to examination and inspection by an INS inspector whose duty it is to determine whether they are permitted to enter the country. See 8 U.S.C. §§ 1224-25; 8 C.F.R. § 235.3. If an alien does not appear to be someone clearly entitled to enter--

that is, if the INS inspector suspects that the alien is an "excludable" alien--he is subject to an exclusion hearing to determine whether he is eligible to remain. "Excludable" aliens are defined in 8 U.S.C. § 1182(a). Stowaways are expressly included in the category of "excludable" aliens. 8 U.S.C. §1182(a)(6)(D).

In addition to being excludable aliens, stowaways are generally viewed as a disfavored category. E.g., Yiu Sing Chun v. Sava, 708 F.2d 869, 875 n.21 (2d Cir. 1983). One consequence of this is that, in contrast to other excludable aliens, stowaways are automatically subject to deportation and have no right to a hearing to determine their status. The INA provides:

> The provisions of section 1225 of this title for detention of aliens for examination before special inquiry officers and the right of appeal provided for in section 1226 of this title shall not apply to aliens who arrive as stowaways and no such alien shall be permitted to land in the United States, except temporarily for medical treatment, or pursuant to such regulations as the Attorney General may prescribe for the ultimate departure or removal or deportation of such alien from the United States.

8 U.S.C. § 1323(d). Under this provision stowaways who do not seek political asylum are subject to immediate deportation, and under 8 U.S.C. § 1227(a)(1) the carriers on whose vessel or plane they arrived are responsible for returning them to the place from whence they came, as well as for the costs of any detention for the period between the issuance of the deportation/exclusion order and the actual departure of the stowaways.

This case presents us with the question of whether and to what extent INS may place on carriers the additional burden of detaining and maintaining asylum-seeking stowaways during the period in which their asylum applications are pending. The statutory scheme by its express terms only contemplates placing on carriers the cost of detaining stowaways who are subject to immediate deportation. Asylum seekers cannot, however, be deported pending a decision on their asylum application, 8 U.S.C. § 1105a. A fortiori an asylum-seeking stowaway is not subject to "immediate deportation" while the asylum application is under consideration. Yet the INS has taken the position that it has the authority to parole stowaways who have applied for asylum into the custody of carriers, 8 C.F.R. § 253.1(f)(3), and that carriers may be held liable for the costs of detention and related services during this period. See Legal Opinion of INS Acting General Counsel (January 11, 1991). Moreover, as noted above, INS apparently reserves the right to impose whatever conditions on detention it deems appropriate. Of these three rules, only the first, 8 C.F.R. § 253.1(f)(3), was adopted pursuant to the notice and comment provisions of the APA.

Prior to 1986, INS made carriers responsible for the detention of all excludable aliens, arriving on their planes or vessels, as well as for related costs. See 8 C.F.R. §§ 233.1, 235.3 (1986). In imposing this requirement, INS relied on the provisions of 8 U.S.C. § 1223. That section provided in part:

> Whenever a temporary removal of aliens is made under this section, the vessels or aircraft or transportation lines which

brought them, and the masters, commanding officers, owners, agents, and consignees of the vessel, aircraft, or transportation line upon which they arrived shall pay all expenses of such removal to a designated place for examination and inspection or other place of detention and all expenses arising during subsequent detention, pending a decision on the aliens' eligibility to enter the United States and until they are either allowed to land or returned to the care of the transportation line or to the vessel or aircraft which brought them.

8 U.S.C. § 1223 (repealed Oct. 18, 1986, 100 Stat. 1783-56).

Congress began to express concern about this state of affairs as early as 1985. In that year the House Appropriations Committee noted its apprehension

about the policy of the Immigration and Naturalization Service which requires scheduled passenger airlines to assume custody and financial responsibility for aliens who arrive by plane in the United States without proper documentation. The Committee understands that in the absence of Government detention facilities, air carriers must detain such aliens in custody and in all cases pay for their food and shelter. The Committee believes this policy raises significant questions about the equity and legal propriety of requiring private entities to assume the financial burdens of maintaining and, at times, exercising physical custody over excluded aliens for extended periods of time. Specifically, the Committee is concerned about the possible ramifications of detention of aliens by airline personnel or their agents who are not, of course, law enforcement officials.

H.R. Rep. No. 197, 99th Cong., 1st Sess., at 38 (1985). Accordingly, the Committee requested that the INS Commissioner submit a report concerning the policy, which was to include a discussion of

11

the effect of a change in policy which would
require the Immigration and Naturalization
Service to assume all custodial
responsibility when the transporting air
carrier has demonstrated a good faith effort
to detect inadmissibility prior to boarding.

Id.

The Committee reiterated these concerns the following

year.  It expressed
strong support for a change in policy which
would require the INS to assume, in all
cases, all custodial responsibility and
financial responsibility when the
transporting air carriers have demonstrated a
good faith effort to detect inadmissibility
prior to boarding the aircraft.

H.R. Rep. No. 669, 99th Cong., 2d Sess., at 35 (1986).

In 1986, Congress repealed § 1223 and enacted the User

Fee Statute.  Consistent with the congressional concerns outlined

above, one of the new statute's primary functions was to reverse

the existing rule, requiring carriers to bear the expenses of

detaining aliens pending hearings on their immigration status.

The Conference Report, accompanying the bill, described the

relevant provision as follows:
Provides language proposed by the Senate
which would release scheduled passenger
airlines and vessels from the responsibility
to assume custody or financial responsibility
for aliens who arrive by plane or commercial
vessel in the U.S. without proper
documentation.  The House bill contained no
provision on this matter.

H.R. Rep. No. 1005, 99th Cong., 2d Sess., at 421 (1986).  The

statute created a User Fee Account, financed by a five dollar

surcharge on the tickets of international passengers and by civil

fines collected by INS.  The money from the account is to be used

to refund the Attorney General "for expenses incurred by the Attorney General in ... providing detention and deportation services for <u>excludable</u> aliens arriving on commercial aircraft and vessels." 8 U.S.C. § 1356(h)(2)(A)(v) (emphasis added). Neither the statute nor its legislative history suggest any distinctions between the various categories of "excludable" aliens for purposes of this reallocation of the burdens of detention.

As noted above, INS has promulgated a rule, pursuant to notice and comment, in which, despite the User Fee Statute, it has interpreted the INA to authorize it, as one option, to parole stowaways who have requested asylum into the custody of the carrier. "Pending adjudication of the application by the Asylum Officer, the applicant may be detained by the [INS], or paroled into the custody of the ship's agent or otherwise paroled in accordance with § 212.5 of this chapter ... ." 8 C.F.R. §253.1(f)(3). As the following discussion of the statute will reveal, this is a permissible reading of the INA to which we must defer under the doctrine of <u>Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Thus we are concerned here only with the question of responsibility for the costs of detention and its incidents[4] and the related issue of the lack of any standards governing detention by carriers.

---

[4]The question of who bears responsibility for the costs of detention is distinct from the question of who is responsible for taking custody of stowaways. For example, on at least two occasions INS has taken stowaways into its custody without

13

Dia argues that, under the User Fee Statute, INS is required to pay for the detention expenses of stowaways who request asylum. It relies primarily on the fact that stowaways are expressly defined as "excludable" aliens in § 1182(a)(6)(D), as well as the User Fee Statute's unqualified reference to the Attorney General's bearing the costs of detention of excludable aliens. In support of this reading it points to the similarly unqualified language of the legislative history, which also suggests that Congress did not intend to distinguish between stowaways and other excludable aliens in shifting the costs of detention to INS. Dia acknowledges that stowaways who do not request asylum are subject to immediate deportation under §1323(d) and that under § 1227(a)(1) carriers are responsible for the costs of their deportation (including detention incident to deportation) but contends that because those that seek asylum are entitled to a hearing on that request INS should pay detention costs while the hearing is pending.

The government argues, and the district court found, that § 1323(d) makes stowaways a de facto class of "excluded" aliens. Although there is no explicit statutory basis for this categorization, the district court began its analysis by observing that stowaways are subject to immediate deportation with no hearing. It then looked to the language of § 1227(a)(1), which provides that "[a]ny alien ... arriving in the United

relieving carriers from liability for the expense of doing so. See Legal Opinion of INS Acting General Counsel at 2 n.1, 6 (January 11, 1991). And in this case Dia argues that INS should reimburse it for the costs incurred in detaining the stowaways.

States who is excluded under this chapter, shall be immediately deported ... unless the Attorney General, in an individual case, in his discretion, concludes that immediate deportation is not practicable or proper."  From this analysis, the district court understood "excluded" as "a de facto category of aliens termed 'excluded' aliens, meaning those aliens defined as excludable pursuant to 8 U.S.C. § 1182(1) and subject to immediate exclusion and deportation."  Dia Navigation Co., Ltd. v. Reno, 831 F.Supp 360, 367 (D.N.J. 1993).  Under the district court's reading of the statute, once it is conclusively determined that a particular alien is a stowaway, because stowaways are not entitled to an exclusion hearing, the stowaway becomes a member of a class of "excludable" aliens and is therefore "excluded," having become subject to immediate exclusion and deportation.  Id.  If asylum is not granted, "the stowaway is again able to be deported."  Id. at 371.

Aliens who apply for asylum, however, cannot be deported until their applications have been processed and denied. 8 U.S.C. § 1105a.  The district court concluded that asylum-seeking stowaways still fell within the reach of § 1227(a)(1) because of that section's provision relating to aliens whose deportation has been stayed at the discretion of the Attorney General.  Under that reading of the statute, in an instance when the Attorney General exercises her discretion and determines that "immediate deportation is not practicable or proper":
> [t]he cost of the maintenance including
> detention expenses and expenses incident to
> detention of any such alien while he is being

> detained shall be borne by the owner or
> owners of the vessel or aircraft on which he
> arrived ... .

8 U.S.C. § 1227(a)(1).

Dia's response to this interpretation is that the deportation of stowaways who apply for asylum cannot be characterized as having been stayed at the discretion of the Attorney General. Instead, 8 U.S.C. § 1105a requires that deportation be stayed for all asylum applicants. Dia's reading seems correct, and it reveals a fundamental tension in the statutory framework. Sections 1227(a)(1) and 1323(d) require that stowaways be deported immediately unless the Attorney General in the exercise of her discretion determines otherwise, and § 1227(a)(1) places the burden of deportation, and any detention incident to deportation, on the carrier. Section 1105a, however, provides that asylum applicants may not be deported until their applications have been processed, and this is not a matter of discretion. The statute nowhere addresses the question presented here -- the status of an asylum applicant, otherwise excluded, pending the processing of the asylum application.

Presumably the logic of the INS's position is that carriers are responsible for the detention of aliens once they become "excluded" without regard to what might happen after that point. However, this attempt to reconcile these statutes suffers from several flaws. As noted above, the language of § 1227(a)(1) seems to contemplate placing stowaways in the custody of carriers only for the short period between the issuance of their

16

deportation orders and their immediate deportation; its provisions do not encompass situations other than those in which deportation is to be "immediate" or more specifically the detention of stowaways who apply for asylum. The INS's reading of the statute also creates tension with INS regulations. Specifically, 8 C.F.R. § 253.1(f)(3) indicates that a stowaway "shall not be excluded or deported before a decision is rendered by the Asylum Officer on his asylum application." Furthermore, the backdrop for the present statutory scheme is the repeal of §1223, which clearly did place the burden of paying for detention on carriers, and a legislative history strongly evincing congressional desire to place responsibility for detention on INS. Yet INS relies on § 1227(a)(1), the "immediate deportation" provisions, as authority for placing the financial burden of detention in asylum-seeking stowaway cases on the carrier. See Legal Opinion of INS Acting General Counsel (January 11, 1991).

Turning from the statutory language to the regulations we find a similar lack of clear answers. In response to the User Fee Act, INS adopted, pursuant to notice and comment, a rule that "addresses the change from carrier responsibility to INS responsibility for the custody and detention of excludable aliens." 53 Fed. Reg. 1791 (1988) (proposed rule). See also 54 Fed. Reg. 100 (1989) (final rule) (characterizing the rule with substantially the same language). Aside from reiterating what the statutes make clear--that "[c]arriers become liable for detention and transportation expenses immediately upon the issuance of a deportation/exclusion order," 54 Fed. Reg. at 100--

17

the rule does not address the situation with which we are currently faced.  Indeed, in response to commenters' concerns about detention conditions INS noted that the rule "does not address details of specific alien detention conditions.  The conditions under which aliens are held would be a matter for other proceedings."  Id. at 101.[5]

Dia points to a number of other regulatory provisions in support of its contention that the INS policy in this case contravenes INS regulations.  Dia directs our attention to 8 C.F.R. §§ 235.3(e) and 237, both of which indicate that "excluded" aliens are to be delivered to the appropriate carrier, which becomes responsible for the costs of detention from that point.[6]  In stating that rule, however, the regulation, like 8 U.S.C. § 1227(a)(1), does not provide an answer to the question

_____

[5]The rule did set forth minimum criteria for INS detention at non-INS facilities.  Id.; 8 C.F.R. § 235.3(f).  As counsel agreed, however, those criteria do not apply to detention by carriers.
[6]Section 235.3(e) states:
> [If i]n the opinion of the examining immigration officer, it is not practical to resolve a question of admissibility at the time of arrival of an alien passenger on a vessel or aircraft, the officer shall execute a Form I-259C to notify the agent, master, or commanding officer of the vessel or aircraft, if applicable, that the alien passenger may be excludable from the United States and in the event the alien is formally ordered excluded and deported, the carrier will be responsible for detention and transportation expenses to the last foreign port of embarkation as provided in § 237.5 of this chapter.

8 C.F.R. § 235.3(e).

of whether carriers are responsible for the costs of detention
pending the processing of an asylum application.

Dia further argues that under 8 C.F.R. § 235.3(d) the
INS is responsible for the cost of detaining all aliens, except
"Transit Without Visa" passengers.  The relevant provisions are
as follows:

> (b) Aliens with no documentation or false
> documentation.  Any alien who appears to the
> inspecting officer to be inadmissible, and
> who arrives without documents ... or who
> arrives with documentation which appears on
> its face to be false, altered, or to relate
> to another person, or who arrives at a place
> other than a designated port of entry, shall
> be detained in accordance with section 235(b)
> [8 U.S.C. § 1225(b)] of the Act.  ...
>
> (c) Aliens with documents.  Any alien who
> appears to the inspecting officer to be
> inadmissible, but who does not fall within
> paragraph (b) of this section, may be
> detained, paroled, or paroled for deferred
> inspection by the inspecting officer.  ...
> (d) Service custody.  The Service will assume
> custody of any alien subject to detention
> under § 235.3 (b) or (c) of this section,
> except in the case of an alien who is
> presented as a Transit Without Visa (TWOV)
> passenger.

8 C.F.R. § 235.3.

Dia points out that this section divides aliens into
only two categories--those with documents and those without--and
argues that stowaways clearly will be either one or the other.
Thus, because the reference in subsection (d) is to "any alien,"
Dia contends that INS is violating its own regulations by not
taking custody of stowaways who seek asylum.

The government's response to this argument is that the statutory provision the rule implements concerns only the detention of those aliens "who may not appear to the examining immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land [and] shall be detained for further inquiry to be conducted by a special inquiry officer." 8 U.S.C. § 1225(b). In contrast to such aliens, stowaways are clearly not entitled to land. 8 U.S.C. § 1323(d). As such, they are not within the ambit of § 1225(b) or 8 C.F.R. § 235.3(b), and thus 8 C.F.R. § 235.3(d) does not apply. In addition, we note that the regulation by its terms concerns only responsibility for the custody of aliens. As we have explained above, the question of custody is distinct from that of financial responsibility and is already addressed by the regulations.

The inescapable conclusion of our analysis is that no clear answer emerges from the statutes and regulations. Congress clearly wished to shift the bulk of financial responsibility for detention to INS, but neither the statute nor the legislative history provide an indication of whether it wished to shift that burden with respect to stowaways who apply for asylum. The question, quite simply, was not answered. Similarly, the regulations evince no consideration of the issue except to the extent that INS has reserved the right to force carriers to take custody of such aliens. Moreover, neither the statutes nor the regulations address the conditions in which aliens are to be detained. Indeed, the INS at oral argument before us conceded that, even though the INS considers § 1227(a)(1) to make more

20

sense when read the government's way, i.e., holding the carrier responsible for detention, there's no need to read it that way. In light then of the statutory and regulatory language and of the INS's concession, we must determine whether INS's position regarding carrier responsibility was legitimately adopted.

III.

> The APA defines "rule" broadly to include: the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing.

5 U.S.C. § 551(4). In light of this broad definition we think it plain that the INS policies at issue in this case constitute rules for purposes of the APA.

> Under the APA, [g]eneral notice of proposed rulemaking shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with the law. ... Except when notice or hearing is required by statute, this subsection does not apply--
> (A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice ... .

5 U.S.C. § 553(b). When an agency is required to give notice, it must then consider the comments of interested parties upon the

21

proposed rule, 5 U.S.C. § 553(c), and publish the final rule within thirty days of its effective date. 5 U.S.C. § 553(d).

The distinction between "substantive" or "legislative" rules and "interpretive" or "interpretative" rules has proven to be one incapable of being drawn with much analytical precision. Indeed, courts customarily begin recitations of the law on the subject with remarks such as the distinction is "fuzzy," National Family Planning and Reproductive Health Ass'n v. Sullivan, 979 F.2d 227, 231 (D.C. Cir. 1992); "'enshrouded in considerable smog,'" La Casa Del Convaleciente v. Sullivan, 965 F.2d 1175, 1177 (1st Cir. 1992) (quoting General Motors Corp. v. Ruckelshaus, 742 F.2d 1561, 1565 (D.C. Cir. 1984)); or "'far from crystal clear.'" Metropolitan Sch. Dist. v. Davila, 969 F.2d 485, 489 (7th Cir. 1992) (quoting Chemical Waste Management, Inc. v. EPA, 869 F.2d 1526, 1534 (D.C. Cir. 1989)), cert. denied, 113 S.Ct. 1360, 122 L.Ed.2d 740 (1993). And the cases live up to this billing, setting forth tests that are often circular and usually somewhat Delphic. Nevertheless, certain principles emerge, and, while we are not able to capture their essence any more succinctly than our predecessors, we believe their application in this case is clear.

Our most recent statement of the law on this question appeared in FLRA v. Department of the Navy, 966 F.2d 747 (3d Cir. 1992)(in banc). The critical difference between legislative and interpretative rules, we noted, is that the former "have the force and effect of law" while the latter do not. Id. at 762 n.14. Stated differently, legislative rules have "substantive

legal effect," while interpretative rules typically involve construction or clarification of a statute or regulation. <u>Id</u>. See also <u>Bailey v. Sullivan</u>, 885 F.2d 52, 62 (3d Cir. 1989); <u>United States v. Walter Dunlap & Sons, Inc.</u>, 800 F.2d 1232, 1238 (3d Cir. 1986). "If a rule creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself, then it is substantive." <u>La Casa Del Convaleciente</u>, 965 F.2d at 1178. Put yet another way,

> what distinguishes interpretative from legislative rules is the legal base upon which the rule rests. If the rule is based on specific statutory provisions, and its validity stands or falls on the correctness of the agency's interpretation of those provisions, it is an interpretative rule. If, however, the rule is based on an agency's power to exercise its judgment as to how best to implement a general statutory mandate, the rule is likely a legislative one.

<u>United Technologies Corp. v. EPA</u>, 821 F.2d 714, 719-20 (D.C. Cir. 1987).

Of course as applied to many rules, such statements are apt to amount to conclusions about the rule rather than principled bases on which to categorize them. Thus courts have inquired into the agency's perception of the rule. This inquiry concerns first the agency's characterization of the rule as legislative or interpretative. <u>See, e.g.</u>, <u>Davila</u>, 969 F.2d at 489; <u>United Technologies</u>, 821 F.2d at 718; <u>Levesque v. Block</u>, 723 F.2d 175, 182 (1st Cir. 1983); <u>Cerro Metal Prods. v. Marshall</u>, 620 F.2d 964, 981 (3d Cir. 1980). The more basic determination, however, involves whether "'if by its action the agency intends to create new law, rights or duties.'" <u>United Technologies</u>, 821

23

F.2d at 718 (quoting General Motors Corp. v. Ruckelshaus, 742 F.2d 1561, 1565 (D.C. Cir. 1984) (en banc), cert. denied, 471 U.S. 1074 (1985)). See also Daughters of Miriam Center for the Aged v. Mathews, 590 F.2d 1250, 1255 n.9 (3d Cir. 1978). Courts have also looked more broadly to "the impact that a given rule has on those to whom the rule applies." Ohio Dep't of Human Servs. v. HHS, 862 F.2d 1228, 1233 (6th Cir. 1988). While the substantial impact of a rule is relevant to its classification, however, such an impact will not, without more, compel a finding that a rule is legislative. Davila, 969 F.2d at 493; La Casa Del Convaleciente, 965 F.2d at 1178.

Recognizing that even consideration of all these factors will not always lead to a clear determination, we noted in FLRA v. Department of the Navy that it is often helpful to analyze a rule with an eye to the policies animating the APA's notice and comment requirement. FLRA v. Navy, 966 F.2d at 762 n.14 (citing Batterton v. Marshall, 648 F.2d 694, 705 (D.C. Cir. 1980)). As the D.C. Circuit noted in Batterton: "Analysis that improves upon semantic play must focus on the underlying purposes of the procedural requirements at issue. The essential purpose of according § 553 notice and comment opportunities is to reintroduce public participation and fairness to affected parties after governmental authority has been delegated to unrepresentative agencies." 648 F.2d at 703. See also Morton v. Ruiz, 415 U.S. 199, 232, 94 S.Ct. 1055, 1073 (1974) ("The Administrative Procedure Act was adopted to provide, inter alia, that administrative policies affecting individual rights and

24

obligations be promulgated pursuant to certain stated procedures so as to avoid the inherently arbitrary nature of unpublished ad hoc determinations.").

Consideration of these factors in the context of this case leads us to the conclusion that the INS rules here are legislative in nature. As our analysis in the preceding section reveals, the statute simply does not set out a standard concerning liability for the costs of detention in cases such as this. Any attempt to divine an answer leads only to the conclusion that there is tension if not outright inconsistency within the INA to the extent that it can be read as addressing the question. Moreover, there is no suggestion that the statute speaks at all to the conditions of detention. Yet, in the face of what is at best statutory ambiguity, INS has adopted rules holding carriers liable for unlimited costs of detention and imposing custody with no guidelines, or subject only to standards as determined by an INS officer on the scene. This is no less a legislative decision than would be the adoption of a detailed code concerning the limits and conditions of detention.

Our conclusion squares with those of other courts confronted with agency implementation of statutes that do not address the agency action at issue. "In the present case, 'interpretation' could only go so far as to spot the dilemma posed by the statutory inconsistency, while legislative-type action was required to carry the agency the rest of the way ... ." Citizens to Save Spencer County v. EPA, 600 F.2d 844, 879 (D.C. Cir. 1979). See also National Family Planning, 979 F.2d at

237 (noting that filling in gaps and resolving inconsistencies in statutory scheme involves legislative rulemaking); Chamber of Commerce v. OSHA, 636 F.2d 464, 469 (D.C. Cir. 1980) ("It is clear to us that the [agency] has attempted through this regulation to supplement the [statute], not simply to construe it, and therefore the regulation must be treated as a legislative rule."). The INS has stretched the limits of the INA, without the benefit of input from the affected parties, and now contends that these parties are without power to challenge its actions. This plainly amounts to legislative rulemaking.

Our conviction is only strengthened when we consider the impact of the INS's rules. In this case Dia was forced to spend a considerable sum of money detaining the four stowaways under armed guard in a commercial hotel for 54 days--a period which appears to be considerably shorter than is normally needed to process asylum applications. Dia also had to assist the stowaways in the preparation of their applications, which included hiring an interpreter. Perhaps most significantly, Dia was forced to deal with a suicidal stowaway on a hunger strike, with the resulting use of leg irons. This was certainly a less-than-ideal situation for both Dia and the stowaway, and perhaps for the other guests at the Holiday Inn, but the INS refused to assume custody. Episodes such as this appear to be what motivated Congress to enact the User Fee Statute and require the INS to take custody of aliens.

In sum, we hold that, if the INS wishes to impose on private carriers the costs of detaining stowaways who have

26

applied for asylum, it must do so pursuant to the notice and comment requirements of the APA. Moreover, because the decision to impose custody and/or the costs of detention on carriers necessarily involves some decision as to the extent and conditions of these obligations, the INS must adopt its rules, governing these issues and setting forth how questions concerning the extent and conditions of detention will be answered, pursuant to notice and comment.

Because the INS has not conformed with the requirements of the APA in establishing its policy on the costs and conditions of detention of asylum-seeking stowaways pending a decision on the asylum application, the district court erred in failing to grant that portion of Dia's motion for a declaratory judgment to that effect.

IV.

We now turn briefly to Dia's claims for reimbursement of its expenses in detaining the stowaways. Dia argues that it is entitled to reimbursement under the APA and under the Tucker Act. We believe the district court correctly concluded that Dia may not recover its expenses under either of these statutes.

A. The APA

Dia first claims that it is entitled to reimbursement under § 702 of the APA. That section provides in part:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim

27

that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702 (emphasis added). The district court found that the relief Dia seeks qualifies as money damages for purposes of this section, Dia, 831 F.Supp. at 378-80, and that as a result recovery is barred by the doctrine of sovereign immunity. Id. The government urges us to adopt this analysis.

In Bowen v. Massachusetts, 487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988), the Supreme Court noted that "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" Id. at 893, 108 S.Ct. at 2732. In Bowen the state of Massachusetts sued the Secretary of Health and Human Services to enforce a provision of the Medicaid Act which required payment of certain amounts to the state for Medicaid services. The Court noted that Massachusetts' suit

is not a suit seeking money in compensation for the damage sustained by the failure of the Federal Government to pay as mandated; rather, it is a suit seeking to enforce the statutory mandate itself, which happens to be one for the payment of money. The fact that the mandate is one for the payment of money must not be confused with the question whether such payment, in these circumstances, is a payment of money as damages or as specific relief.

Id. at 900-01, 108 S.Ct. at 2735. The Court concluded that "since the [district court's] orders are for specific relief (they undo the Secretary's refusal to reimburse the State) rather

28

than for money damages (they do not provide relief that substitutes for that which ought to have been done) they are within the District Court's jurisdiction under § 702's waiver of sovereign immunity." Id. at 910, 108 S.Ct. at 2740.

Following the Supreme Court's lead, this court has similarly determined that a monetary award can in some instances constitute equitable relief rather than money damages for purposes of § 702. See Zellous v. Broadhead Assocs., 906 F.2d 94 (3d Cir. 1990). Other courts have reached the same conclusion. See, e.g., Esch v. Yeutter, 876 F.2d 976, 984 (D.C.Cir. 1989); Beverly Hospital v. Bowen, 872 F.2d 483, 487 (D.C.Cir. 1989). As the district court concluded, "all of these cases have concerned some form of statutory entitlement to monetary relief." Dia, 831 F.Supp. at 378. The crucial distinction involves whether a claimant "'is seeking funds to which a statute allegedly entitles it, rather than money for the losses ... suffered by virtue of'" the agency's failure to do that which it was required to do. Bowen, 487 U.S. at 901, 108 S.Ct. at 2735 (quoting Maryland Dept. of Human Resources v. Department of Health and Human Services, 763 F.2d 1441, 1446 (D.C.Cir. 1985)).

In this case the reimbursement Dia seeks falls squarely within the category of "money damages" as prior case law has defined that term. The INA simply does not speak to the question of responsibility for the costs of detention of stowaways who apply for asylum. Thus there is no statutory entitlement to these funds. Instead, Congress has explicitly given the INS the authority to promulgate regulations as it deems necessary in

implementing the INA. 8 U.S.C. § 1103. The entitlement to these costs, then, must originate from INS rather than from a court that lacks the requisite expertise and information to craft an appropriate standard. Indeed, were we to fashion a rule out of Congress' silence simply because Dia has alleged a statutory entitlement we would not only be usurping the role of the agency but also inviting parties to use § 702 to circumvent administrative agencies in favor of the courts. We cannot allow the identity of the decisionmaker to be determined by crafty lawyering. Cf. Bowen, 487 U.S. at 915-16, 108 S.Ct. at 2743 (Scalia, J., dissenting).

As we view this case, the wrong that Dia has suffered is not the denial of money to which the INA entitles it, but rather the INS' failure to follow the appropriate procedures in implementing the INA. An award of money in these circumstances could only be characterized as a substitute for what ought to have been done, and therefore would constitute money damages. As such, Dia's claim is barred by the doctrine of sovereign immunity.

B. The Tucker Act

The district court dismissed Dia's Tucker Act claim on the ground that it lacks substantive merit. Dia, 831 F.Supp. at 380 n.40. We conclude that the district court correctly dismissed this claim, though we do not reach the merits of the claim because we hold that the district court lacked jurisdiction over it.

As our prior cases make clear:

> Under the Tucker Act, the United States
> Claims Court and district courts share
> original jurisdiction over non-tort monetary
> claims against the United States not
> exceeding $10,000.  28 U.S.C. § 1346(a)(2)
> (sometimes referred to as the "Little Tucker
> Act").  Original jurisdiction over such
> claims seeking more than $10,000 vests
> exclusively in the Claims Court.  28 U.S.C.
> §1491 (the so-called "Big Tucker Act").

Chabal v. Reagan, 822 F.2d 349, 353 (3d Cir. 1987).  See also

United States v. Hohri, 482 U.S. 64, 67 n.1, 107 S.Ct. 2246, 2249

n.1, 96 L.Ed.2d 51 (1987); Livera v. First Nat'l State Bank of

N.J., 879 F.2d 1186, 1195 (3d Cir.), cert. denied sub nom. Livera

v. Small Business Admin., 493 U.S. 937, 110 S.Ct. 332, 107

L.Ed.2d 322 (1989); Hahn v. United States, 757 F.2d 581, 585-86

(3d Cir. 1985).

Dia asserts that the Claims Court's exclusive

jurisdiction is overridden by the Supplemental Jurisdiction Act.

28 U.S.C. § 1367.  We reject this argument in light of the Tucker

Act's explicit jurisdictional bar.  See Pershing Div. of

Donaldson, Lufkin & Jenrette Secs. Corp. v. United States, --F.3d

---, 1994 WL 153956, *1-2 (7th Cir. 1994).  Dia has alleged

damages amounting to $127,580, far in excess of the maximum claim

over which the district court could exercise its jurisdiction.

The district court therefore properly dismissed this claim.

V.

For the foregoing reasons, we will reverse the district

court's order, dismissing Dia's complaint, and we will remand

this case to the district court to award a declaratory judgment

in favor of Dia on its claim that the INS policy on the costs and

31

conditions of detention of asylum-seeking stowaways is invalid

for failure to comply with the notice and comment procedures of

the APA.  We will affirm the order of the district court insofar

as it dismissed Dia's other claims, including its claim for

monetary relief.