NYGAARD, Circuit Judge,
dissenting.
Today, the majority holds that, by the simple expedient of writing a letter, a sub-eabinet-level federal bureaucrat can preempt the statutory enactment of an elected state legislature. It bases its holding on the principle of deference set forth in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and later cases. Because I believe that what the Secretary would have us give her is not deference due, but rather deference run amok, I reach a different result than the majority, and must dissent.[1]
I.
A.
Federal courts are commanded by Chevron and a host of other cases to give deference to certain legal conclusions of administrative agencies. But deference “cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress.” BATF v. FLRA, 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983); accord EEOC v. Arabian Am. Oil Co. (“ARAMCO”), 499 U.S. 244, 260-62, 111 S.Ct. 1227, 1237, 113 L.Ed.2d 274 (1991) (Scalia, J., concurring) (“deference is not abdication”); St. Luke’s Hosp. v. Secretary of Health & Human Servs., 810 F.2d 325, 332 (1st Cir.1987) (quoting BATF). It is therefore vital that we carefully consider each case to determine whether deference is warranted, and, if so, how much to accord. Anything less has the potential to be judicial abdication rather than judicial review. See Hi-Craft Clothing Co. v. NLRB, 660 F.2d 910, 914-16 (3d Cir.1981); West v. Bowen, 879 F.2d 1122, 1134 (3d Cir.1989) (Mansmann, J., concurring and dissenting); Hon. Joseph W. Weis, Jr., A Judicial Perspective On Deference to Administrative Agencies: Some Grenades From the Trenches, 2 Admin.L.J. 301, 307 (1988).
B.
The full language of the Hyde Amendment provides as follows:
None of the funds appropriated under this Act shall be expended for any abortion except when it is made known to the Federal entity or official to which funds are appropriated under this Act that such procedure is necessary to save the life of the mother or that the pregnancy is the result of an act of rape or incest.
*186 Pub.L. No. 103-112, § 509, 107 Stat. 1082, 1113 (1993). As written, the statutory language neither requires nor forbids state reporting requirements in cases of rape or incest, and the majority quite correctly rejects the position of the providers and the district court that such requirements are per se in conflict with the Hyde Amendment (majority at 178-180). The majority then goes on to hold that we must defer under Chevron to the interpretation of the Director of the Medicaid Bureau that reporting and certification requirements are invalid in the absence of a waiver provision. Id. at 183-185. I believe this to be incorrect.
C.
In Chevron, the Environmental Protection Agency promulgated a legislative rule to define the statutory term “stationary source” as an entire manufacturing plant. The Clean Air Act, while requiring permits for new or modified stationary sources, gave no indication of how such a source should be defined. In approaching the standard for judicial review of the agency’s choice, the Supreme Court employed a bifurcated analysis:
First, always, is the question of whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction of the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency’s answer is based on a permissible construction of the statute.
467 U.S. at 842-43, 104 S.Ct. at 2781-82 (footnotes omitted).
To recapitulate, “the appropriate level of deference due an agency’s construction of a statute that it administers depends on the clarity of the statute.” Pennsylvania v. United States Dep’t of Health & Human Servs., 928 F.2d 1378, 1383-84 (3d Cir.1991). In Chevron step one, we examine the statutory language to determine whether Congress has directly spoken to the issue; if it has, we do not even proceed to step two. Pennsylvania Medical Soc’y v. Snider, 29 F.3d 886, 902 (3d Cir.1994). Only if Congress has not spoken may we apply step two of the Chevron analysis. And then we are limited to reviewing whether the agency’s construction of the statute is “permissible.” Before a reviewing court can even reach step two, however, it must find that Congress explicitly or implicitly delegated to the agency the authority to construe the statutory provision at issue. See Adams Fruit Co. v. Barrett, 494 U.S. 638, 649, 110 S.Ct. 1384, 1390, 108 L.Ed.2d 585 (1990) (“[A] precondition to deference under Chevron is a congressional delegation of administrative authority.”). I simply do not believe there was a delegation here. See infra part IV.
II.
A.
.The majority, relying on Bailey v. Sullivan, 885 F.2d 52, 62 (3d Cir.1989) and American Mining Congress v. Mine Safety & Health Admin., 995 F.2d 1106, 1112 (D.C.Cir.1993), concludes that the letters constitute validly promulgated interpretive rules rather than legislative rules (majority at 181).[2] I agree reluctantly that, under binding circuit precedent, the letters must be treated as interpretive rules. Were I unfettered by precedent, however, I would con- *187 elude that the letters are “spurious rules,” entitled to no weight whatsoever, as I shall explain shortly.
In Bailey, we opined that “[i]f the rule in question merely clarifies or explains existing law or regulations, it will be deemed interpretive.” 885 F.2d at 62. The majority seems to imply that, because the two letters clarify and explain the already-existing Medicaid Act and Hyde Amendment, they are interpretive. But this reasoning proves too much. Indeed, it is difficult to conceive of any nonprocedural regulation that does not in some way explain or clarify an existing federal statute.
The reported decisions have been nearly unanimous in adopting a more restricted definition of what type of rule merely clarifies or explains existing law. If the position the agency takes in its rule flows directly from the statutory language itself, i.e., the court would reach the same construction of the statute even in the absence of the regulation, the rule is interpretive. On the other hand, if the rule exercises a congressional delegation of power to make binding rules that create rights, assign duties or impose obligations, it is legislative. This distinction was aptly explained in Dia Navigation Co. v. Pomeroy, 34 F.3d 1255 (3d Cir.1994), where we stated, relying in part on FLRA v. Dep’t of the Navy, 966 F.2d 747, 762 n. 14 (3d Cir.1992) (in bane):
The critical difference between legislative and interpretive rules is that the former have the force and effect of law while the latter do not. Stated differently, legislative rules have substantive legal effect, while interpretive rules typically involve construction or clarification of a statute or regulation. If a rule creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself, then it is substantive [legislative]. Put yet another way, “what distinguishes interpretive from legislative rules is the legal base upon which the rule rests. If the rule is based on specific statutory provisions, and its validity stands or falls on the correctness of the agency’s interpretation of those provisions, it is an interpretive rule. If, however, the rule is based on an agency’s power to exercise its judgment as to how best to implement a general statutory mandate, the rule is likely a legislative one.” United Technologies Corp. v. EPA, 821 F.2d 714, 719-20 (D.C.Cir.1987).
34 F.3d at 1264 (some citations and internal quotation marks omitted).[3] Thus, to the extent the majority purports to hold that any rule that explains or clarifies an existing statute or regulation is interpretive notwithstanding the fact that the duties imposed thereby do not flow directly from the statutory language, its holding contravenes earlier decisions of this court, in violation of Third Circuit Internal Operating Procedure 9.1.
American Mining is nothing more than a refinement of the law discussed above; that is to say, for a rule to be legislative and have the force of law, Congress must have delegated legislative power to the agency and the agency must have intended to exercise that power in promulgating its rule. 995 F.2d at 1109. Under this test, to determine whether a rule is legislative or interpretive, a reviewing court uses four factors, any one of which indicates that the rule is legislative. The first, whether in the absence of the rule the agency could not succeed in an enforcement action, id. at 1112, simply restates the law discussed above. The others, which include whether the agency has published its rule in the Code of Federal Regulations, whether the agency has explicitly invoked its legislative authority, or whether the rule amends a prior legislative rule, id., are additional factors indicating that a rule is legislative.
*188 B.
Under the American Mining test, the two letters at issue here are distinctly legislative in character. Looking only at the plain language of the statute, there is simply no way that the Hyde Amendment itself can be construed to require or forbid reporting and certification requirements, with or without a waiver provision. Even the majority recognizes as much, because it relies entirely on Chevron deference to reach its holding that Pennsylvania law is preempted. See majority at 181-83. In the absence of the two letters, there would be no plausible argument that Pennsylvania’s reporting and certification requirements are invalid. Accordingly, the letters fail the American Mining and Dia Navigation tests; they are not interpretive rules.
Because the Secretary failed to follow the § 553 notice and comment procedure, however, her two letters, while legislative in character, have no force of law whatsoever. See Chrysler Corp. v. Brown, 441 U.S. at 302-03, 99 S.Ct. at 1718; Alaska v. United States Dep’t of Transp., 868 F.2d 441, 445 (D.C.Cir.1989); Charles H. Koch, Jr. & Ronald F. Wright, Jr., Administrative Law and Practice § 3.13, at 49 (Supp.1995). Indeed, as Professor Anthony points out, they are not true legislative rules at all, but rather examples of invalid “spurious rules;” that is, they are rules that go beyond mere interpretation of existing law and purport to have binding effect, yet were not submitted to notice and comment rulemaking. Robert A. Anthony, “Interpretive” Rules, “Legislative” Rules and “Spurious” Rules: Lifting the Smog, 8 Admin. L.J. 1, 9-10, 14 (1994). Discussing American Mining, Professor Anthony argues that any rule meeting any of American Mining’s four criteria without being subjected to notice and comment is a spurious rule and has no validity. Id. at 15-22. I agree.
Nevertheless, precedent constrains us to treat these two letters as interpretive rules. In Daughters of Miriam Ctr. v. Mathews, 590 F.2d 1250, 1255-56 & n. 9 (3d Cir.1978), we stated that, because the agency’s rules were not promulgated in accordance with § 553 of the Administrative Procedure Act, 5 U.S.C. § 553, “they perforce must be considered interpretive rules.” We also relied on the agency’s characterization of the rules as interpretive. Id. Two years later, we followed the Mathews approach, “tak[ing] the agency at its word” that its rule was interpretive. Cerro Metal Prods. v. Marshall, 620 F.2d 964, 981-82 (3d Cir.1980).[4] Thus, and although I strenuously disagree with the result, under Third Circuit Internal Operating Procedure 9.1 we must treat the agency’s two letters as interpretive rules, despite their spurious character. See United States v. Monaco, 23 F.3d 793, 803 (3d Cir.1994).[5]
C.
The fact that we are required to treat the two letters as interpretive rules does not excuse the agency from its failure to follow the notice and comment rulemaking procedure, however. Where, as here, a regulatory agency intends to bind the public or the states, it is incumbent upon it to promulgate a valid legislative rule. As we said in Dia Navigation, the purpose of the § 553 notice and comment procedure is to insure public participation by and fairness to affected parties when lawmaking authority has been delegated to unelected, unrepresentative regulatory agencies. 34 F.3d at 1255 (quoting Batterton v. Marshall, 648 F.2d 694, 703 *189 (D.C.Cir.1980)). It “avoid[s] the inherently arbitrary nature of unpublished determinations.” Morton v. Ruiz, 415 U.S. 199, 232, 94 S.Ct. 1055, 1073, 39 L.Ed.2d 270 (1974). Notice and comment also serves the salutary purpose of forcing the agency to educate itself on the facts, issues and policy options available before issuing binding regulations. FLRA, 966 F.2d at 763 (quoting Texaco, 412 F.2d at 744); Batterton v. Marshall, 648 F.2d at 703-04 (same); accord Marshall v. Western Union Tel. Co., 621 F.2d 1246, 1254 (3d Cir.1980); Robert A. Anthony, ‘Well, You Want the Permit, Don’t You?” Agency Efforts to Make Nonlegislative Documents Bind the Public, 44 Admin L.Rev. 31, 32 (1992) [hereinafter Anthony, Agency Efforts]. I can say it no better than Professor Anthony, who states:
Values served by the legislative rule-making process are large ones. Fairness is furthered by giving notice to those who are to be bound, both when the proposed rule is about to be considered and when the final rule is definitively published. The accuracy and thoroughness of an agency’s actions are enhanced by the requirement that it invite and consider the comments of all the world, including those of directly affected persons who are able, often uniquely, to supply pertinent information and analysis. The acceptability and therefore the effectiveness of a final rule are elevated by the openness of the procedures through which it has been deliberated and by the public’s sense of useful participation in a process that affects them. Its legitimacy rests upon all of these considerations, as well as upon the foundational fact that the agency has observed the procedures laid down by Congress for establishing rules with the binding force of law. The agency’s accountability for its rules is deepened by the court-made requirement of a reasoned explanation based upon a substantial rule-making record.
Beyond all of this, the APA rulemaking requirements impose a salutary discipline. That discipline deters casual and sloppy action, and thereby forestalls the confusion and needless litigation that can result from such action. And that discipline reduces tendencies toward over-regulation or bureaucratic overreaching, and discourages low-profile attempts to create practically-binding norms that Congress or the Administration would not have approved.
Robert A. Anthony, Interpretive Rules, Policy Statements, Guidances, Manuals, and the Like — Should Federal Agencies Use Them to Bind the Public?, 41 Duke L.J. 1311,1373-74 (1992), also published as Administrative Conference of the United States, Recommendations and Reports, Report for Recommendation 92-2, 1992 ACUS 71, 136-37.[6]
In New Jersey v. Department of Health & Human Servs., 670 F.2d 1262, 1281 (3d Cir.1981), we explained:
The APA notice and comment procedures exist for good reason: to ensure that unelected administrators, who are not directly accountable to the populace, are forced to justify their quasi-legislative rulemaking before an informed and skeptical public. When these procedures are not followed in situations where they are in fact applicable, a court promotes neither the agency’s ultimate mission nor respect for the law by ignoring the agency’s indiscretion or condoning the agency’s shortcut.
There is indeed a great danger in giving Chevron deference (and often, legislative effect) to rules promulgated without the benefit of notice and comment rulemaking. First of all, it encourages agencies to flout the Administrative Procedure Act and issue binding regulations in informal formats. See Community Nutrition Inst. v. Young, 818 F.2d 943, 953 (D.C.Cir.1987) (Starr, J., concurring and dissenting) (agencies may yield to temptation and issue rules with legislative effect in interpretive formats to avoid scrutiny). After all, once a reviewing court defers to the agency and upholds a rule, as the *190 majority does here, it becomes law without the bother of the agency taking true legislative action. Worse, it results in private parties (and, in this case, the Commonwealth of Pennsylvania) being bound by “a proposition they had no opportunity to shape and will have no meaningful opportunity to challenge when it is applied to them.” National Family Planning & Reprod. Health Ass’n, Inc. v. Sullivan, 979 F.2d 227, 240 (D.C.Cir.1992) (citing Anthony, Agency Efforts, supra, at 38; quoting Robert A. Anthony, Which Agency Interpretations Should Bind Citizens and the Courts, 7 Yale J. on Reg. 1, 58 (1990)); see also 1 Kenneth C. Davis & Richard J. Pierce, Administrative Law Treatise § 3.5, at 119-20 (1994) (Chevron deference inappropriate for nonlegislative rules). I find such a result both politically undemocratic and juris-prudentially odious.
III.
The majority, while treating the two letters as interpretive rules, nevertheless gives them full deference under Chevron, a case that arose in the context of a legislative rule and quite different jurisprudential concerns. I believe that this, too, is incorrect.
A.
Before Chevron, the amount of consideration to be given interpretive rules was well-settled. The classic statement from the Supreme Court was given in Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944):
We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.
This approach was reaffirmed three decades later in General Elec. Co v. Gilbert, 429 U.S. 125, 141-42, 97 S.Ct. 401, 411, 50 L.Ed.2d 343 (1976), where the Court analyzed an EEOC guideline as an interpretive rule under the Skidmore doctrine.[7]
Chevron, of course, was a watershed decision in the area of judicial deference to regulatory agencies. Significantly, however, Chevron involved a properly promulgated legislative rule. That case simply did not deal with the level of consideration a court should give to an interpretive rule, and did not overrule Skidmore.
Indeed, in the years following Chevron, the Supreme Court has reaffirmed that Skid-more consideration is the appropriate standard of review for interpretive rules. In Martin v. Occupational Safety & Health Review Comm’n, 499 U.S. 144, 157, 111 S.Ct. 1171, 1179, 113 L.Ed.2d 117 (1991), the Court, citing Skidmore, opined that interpretive rules are not “entitled to the same deference as norms that derive from the exercise of the Secretary’s delegated lawmaking powers[.]” And in ARAMCO, the Supreme Court again relied upon Skidmore and Gilbert, not Chevron, to determine how much weight to give an interpretive rule. 499 U.S. at 256-58, 111 S.Ct. at 1235;[8] accord Public Citizen v. United States Dep’t of Justice, 491 U.S. 440, 463 n. 12, 109 S.Ct. 2558, 2571-72 n. 12, 105 L.Ed.2d 377 (1989) (interpretive rule entitled to less weight, relying on Gilbert). It is therefore manifest that Skidmore and Gilbert survived Chevron.
Recently, in dicta, four panels of this court have questioned whether Skidmore or Gilbert were overruled by Chevron. See E.I. duPont de Nemours & Co. v. Commissioner, *191 41 F.3d 130, 135-36 n.23 (3d Cir.1994); Sekula v. Federal Deposit Ins. Corp., 39 F.3d 448, 453-54 n.13 (3d Cir.1994); Reich v. Local 30, Int’l Bhd. of Teamsters, 6 F.3d 978, 987 n.14 (3d Cir.1993); International Raw Materials, Ltd. v. Stauffer Chemical Co., 978 F.2d 1318, 1325 n.9 (3d Cir.1992), cert. denied, — U.S. —, 113 S.Ct. 1588, 123 L.Ed.2d 154 (1993). None of these opinions discussed the effect of Martin or ARAMCO.
In fact, in several cases decided after Chevron, we have not given Chevron-style deference to interpretive rules. In Armstead v. United States Dep’t of Housing & Urban Dev., 815 F.2d 278, 282 (3d Cir.1987), we stated that interpretive rules are not binding on the agency or the court. Likewise, in American Ambulance Serv., Inc. v. Sullivan, 911 F.2d 901, 908 (3d Cir.1990), we opined that “[ijnterpretive rules are entitled to no more weight on judicial review than their inherent persuasiveness commands” (citing Batterton v. Marshall, 648 F.2d at 705). Indeed, in FLRA we applied this standard of review to an interpretive rule announced in letter form and refused to give it controlling weight. 966 F.2d at 762-64 & n. 14. I think the above line of cases makes it clear that neither the Supreme Court nor this court has recognized any erosion of Skidmore or Gilbert.
In Snider, we refused to apply Chevron, holding that the statute was unambiguous under step one of the test and opining that “[cjomplexity alone is not enough to trigger Chevron.” 29 F.3d at 902. We did, however, in evaluating the Secretary’s position, look to one of the Skidmore factors to determine how much consideration to give to her interpretation. Because the Secretary had changed her position on the issue, we refused to give her interpretation “any deference,” id., although it is perhaps more accurate to say that we gave it consideration but not controlling weight.[9] In a similar vein is Mazza v. Secretary of Health and Human Servs., 903 F.2d 953, 958-59 (3d Cir.1990), in which, citing Skidmore and Gilbert, we rejected an agency interpretation that contradicted its earlier position.
One of our cases contains some language that superficially seems to support the majority’s position. In Kean v. Heckler, 799 F.2d 895, 902 (3d Cir.1986), we purported to defer under Chevron to an agency interpretation. Yet, we went on to consider factors normally relevant only in a Skidmore-Gilbert analysis, including the Secretary’s alleged change in position, the fact that her interpretation was contemporaneous with the enactment of the statute, and the expertise of her agency. Id. at 902-03. Nowhere did we even intimate that Chevron had overruled Skidmore or Gilbert. In any event, even if Kean did hold that Chevron deference is required for agency interpretations, I conclude that it was implicitly overruled by the Supreme Court in Martin and ARAMCO.
Many other courts agree that Skidmore-Gilbert is the appropriate standard of review for interpretive rules. In Atchison, T. & S.F. Ry. v. Peña, 44 F.3d 437 (7th Cir.1994) (en banc), cert. granted, — U.S. —, 115 S.Ct. 2575, 132 L.Ed.2d 826 (1995), the court, while making clear that an interpretive rule is entitled to some deference, refused to “rubber stamp” the agency’s action and rejected the contention that full Chevron deference applies to such rules. Id. at 442. Instead, it applied the Skidmore factors and held that the interpretation deserved no deference.[10] Significantly, the court also held that any deference (consideration) due an interpretation must arise from “the agency’s diligent study of the statute and the underlying activity it seeks to regulate.” Id. at 443.
Similarly, in Doe v. Reivitz, 830 F.2d 1441 (7th Cir.1987), a federal agency sent a letter to state welfare authorities restricting the eligibility of certain benefits from dependents of illegal aliens. The Secretary argued that *192 his regulation was entitled to Chevron deference, but the court disagreed, opining:
The documents at issue in this case are interpretive rather than legislative in nature, and under longstanding principles, agency interpretations are not entitled to the same degree of deference commanded by the high-powered regulations in Chevron. The Court in Chevron did not purport to alter the scope of review traditionally accorded interpretive documents.
Id. at 1446 (citation omitted). It continued:
HHS did not engage in notice-and-comment rule making in issuing its AFDC-UP eligibility policy. The agency cannot now contend that courts must accord to this policy the deference due a legislative rule when the agency has not followed the normal procedures associated with force-of-law rule making.
Id. The court then went on to analyze the interpretive rule under the Skidmore doctrine, refusing to give controlling weight to the rule on the grounds that the interpretation was not contemporaneous with the passage of the statute and the agency's reasoning was defective. Id. at 1447-51.[11]
Indeed, in the D.C. Circuit, the court of appeals has issued a number of opinions to the effect that interpretive rules do not receive full Chevron deference, but, at most, Skidmore consideration. As one panel said, “[a] binding policy is an oxymoron.” Vietnam Veterans of Am. v. Secretary of the Navy, 843 F.2d 528, 537 (D.C.Cir.1988). In Samaritan Health Serv. v. Bowen, 811 F.2d 1524 (D.C.Cir.1987), the court stated:
While substantive rules are typically characterized as having the force and effect of law, interpretive rules enjoy a lesser deference — doubtless in part because of the absence of public opportunity to com-ment_ Any deference that an interpretive rule may claim depends on “the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.”
Id. at 1529 (quoting Skidmore) (some citations and internal quotation marks omitted); accord American Fed’n of Labor v. Donovan, 757 F.2d 330, 341-42 (D.C.Cir.1985) (interpretive rule, while receiving “some” deference, does not receive full deference); Batterton, 648 F.2d at 702 (nonlegislative rules carry no more weight than their inherent persuasiveness commands).
The majority, however, relies on Health Ins. Ass’n of Am., Inc. v. Shalala, 23 F.3d 412, 424 & n. 8 (D.C.Cir.1994), cert. denied, — U.S. —, 115 S.Ct. 1095, 130 L.Ed.2d 1064 (1995), for the proposition that Chevron “deference is appropriate even though the Secretary’s interpretation is not contained in a ‘legislative rule.’ ” See majority at 182.[12] There, because the parties agreed that Chevron applied, the court did not reach the issue, but stated in dictum that it had “often applied Chevron deference to *193 interpretive rules without comment.” Id. at 424 n. 8 (citing two cases).
One of the cases the Health Insurance court relied on is Wagner Seed Co. v. Bush, 946 F.2d 918 (D.C.Cir.1991), cert. denied, 503 U.S. 970, 112 S.Ct. 1584, 118 L.Ed.2d 304 (1992), in which the EPA issued a rule in a decision letter rather than by notice and comment rulemaking. Id. at 921. The court stated that “it is simply not the law of this circuit that an interpretive regulation does not receive the Chevron deference accorded a legislative regulation.” Id. at 922. Nowhere in its opinion, however, did it address its prior contrary holdings, discussed above, and the eases it relied upon are opaque at best concerning deference to interpretive rules. And notably, although Wagner Seed was decided shortly after the Supreme Court’s decisions in Martin and ARAMCO, the court addressed neither of these cases in its opinion.
The other case cited in Health Insurance is General Motors Corp. v. Ruckelshaus, 742 F.2d 1561, 1566-67 (D.C.Cir.1984), cert. denied, 471 U.S. 1074, 105 S.Ct. 2153, 85 L.Ed.2d 509 (1985). In that case, which was decided only three months after Chevron, the court did apply Chevron deference to an interpretive rule, but again, without analyzing its prior holdings to determine whether they survived Chevron. In any event, General Motors was decided before the Supreme Court’s decisions in Martin and ARAMCO and cannot survive them.
At best, then, these eases indicate an intra-circuit split of authority in the D.C. Circuit on the question of deference to interpretive rules. Given the weight of authority against granting Chevron deference to interpretive rules, I am not persuaded by Health Insurance and the two cases it cites.
As final support for its holding that interpretive rules are entitled to Chevron deference, the majority relies on the Supreme Court’s recent decision in Reno v. Koray, — U.S. —, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995), rev’g Koray v. Sizer, 21 F.3d 558 (3d Cir.1994). See majority at 182. Careful examination of that case reveals it to be inappo-site.
In Koray, we held that time served by a defendant in a halfway house may constitute time spent in official detention, entitling him to credit against his sentence under 18 U.S.C. § 3585(b). Id. at 567. We declined to grant full Chevron deference to Bureau of Prisons internal agency guidelines. Id. at 562. We did, however, citing Motor Vehicle Mfrs. Ass’n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983), accord “some deference” to the extent the agency “engaged in the necessary ‘reasoned’ analysis of this issue.” Id. Although that inquiry bears some similarity to a Skidmore analysis, we did not cite or apply Skidmore, Gilbert, Martin, or ARAMCO in Koray. Then, based entirely on the plain language of the statute, we held that the words “official detention” did not mean, as the government argued, “official detention by the Attorney General or the Bureau of Prisons.” 21 F.3d at 563-64.
Our analysis in Koray was entirely within Chevron step one: whether Congress had plainly spoken to the issue, and the “deference” (really consideration) we gave the agency interpretation was likewise an aid to our step one analysis. See Michael Herz, Deference Running Riot: Separating Interpretation and Lawmaking Under Chevron, 6 Admin.L.J. 187, 208-09 (1992) (Skidmore analysis is a part of Chevron step one). We simply never reached Chevron step two.
Neither did the Supreme Court. In reversing our decision, the Court examined a number of related statutes using the phrase “official detention.” — U.S. at-, 115 S.Ct. at 2025-26. Based entirely on its construction of § 3585(b) in pari materia with the other statutes and on the legislative history, the Supreme Court concluded that “the Bureau’s interpretation is the most natural and reasonable reading of § 3585(b)’s ‘official detention’ language.” Id. at -, 115 S.Ct. at 2027.
The Supreme Court’s decision in Koray is a classic Chevron step one holding; the Court construed the statute in accordance with the clear intent of Congress, and concluded that our construction was erroneous. Because the statute was not ambiguous, the Court simply did not reach step two of the *194 Chevron analysis. The Court stated only that the agency’s interpretive rule “is still entitled to some deference, since it is a permissible construction of the statute[,]”[13] id. (emphasis added) (citations and internal quotation marks omitted), opining that “it would be too much to say that the statute cannot bear the interpretation adopted by the Bureau.” Id. (citation and internal quotation marks omitted).[14]
It is important not to read too much into this language, however. Both courts agreed that the agency’s interpretation was entitled to “some deference.” — U.S. at-, 115 S.Ct. at 2027; 21 F.3d at 562. I believe all the Supreme Court told us in Koray was that, because the agency’s construction of the statute best reflected the clear intent of Congress, we should have given it controlling weight. Koray did not hold that the statute was ambiguous or that there was a delegation of authority to the agency to fill a gap in the statutory scheme. Because of that, as discussed earlier, Koray simply is not a step two case.[15]
In addition, the Koray Court did not overrule, limit or even criticize its earlier decisions in Skidmore, Morton, Gilbert, Martin or ARAMCO. I therefore disagree with the majority’s implicit assertion that the Supreme Court in Koray overruled all of those cases sub silentio. Had the Supreme Court intended to make such a sweeping change in administrative law jurisprudence, it would have done so explicitly. The Supreme Court’s opinion in Koray cannot support such a conclusion. See Neely v. Club Med Management Servs., Inc., Nos. 93-2069, 93-2102, — F.3d —, 1995 U.S.App. LEXIS 19904, *26, 1995 WL 442169, *9 (3d Cir. July 26, 1995) (in banc) (mere ambiguity in Supreme Court opinion insufficient to change existing decisional law). I therefore conclude that Skidmore and Gilbert, not Chevron step two, provide the appropriate standard of review for interpretive rules.
B.
Under the standard enunciated in Skid-more, these two letters, to which we are asked to defer, do not fare well. In Skid-more, the Supreme Court focused on “the thoroughness evident in [the agency’s] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.” 323 U.S. at 140, 65 S.Ct. at 164. It is also appropriate to consider whether the agency’s interpretation is contemporaneous with the passage of the statute and has been in long use. Davis v. United States, 495 U.S. 472, 484, 110 S.Ct. 2014, 2022, 109 L.Ed.2d 457 (1990). Finally, we may examine whether the agency has developed expertise over the subject matter at issue. See Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 651-52, 110 S.Ct. 2668, 2679, 110 L.Ed.2d 579 (1990) (agency expertise is a principal justification for deference); Kelley, *195 17 F.3d at 842; Colorado Pub. Utilities Comm’n v. Harmon, 951 F.2d 1571, 1578-79 (10th Cir.1991); West, 879 F.2d at 1136-37 (Mansmann, J., concurring and dissenting); Capitano, 732 F.2d at 1076; Mathews, 590 F.2d at 1259.
First of all, it is apparent that the agency did not thoroughly consider the issue of reporting and certification requirements. In the two letters to state Medicaid directors, the agency provides no explanation at all why states must have a waiver provision. Other than the explanation it offers in its amicus brief (which we requested), the agency offers no justification for its rule. This is similar to the situation we faced in Mathews, 590 F.2d at 1258, where we rejected the agency’s interpretation.
Even in her brief, the Secretary states only that lack of a waiver provision could become an “insuperable barrier” to victims of rape and incest seeking Medicaid-funded abortions, relying entirely on the fact that rape is a “vastly underreported” crime. This is both speculative and shallow reasoning, and, in any event, is nothing more than a litigating position entitled to no weight. See Martin, 499 U.S. at 156-57, 111 S.Ct. at 1179; Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 212, 109 S.Ct. 468, 473-74, 102 L.Ed.2d 493 (1988). Fundamentally, I remain unconvinced that the Secretary has really taken the necessary “hard look” at this question. Cf. Greater Boston Television Corp. v. Federal Communications Comm’n, 444 F.2d 841, 851-52 (D.C.Cir.1970) (“hard look” necessary to satisfy reviewing court that agency action not based on “impermissible whim, improper influence or misplaced zeal”), cert. denied, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971).
Second, although the agency’s position is temporally fairly close to the enactment of the 1994 Hyde Amendment, it is not one of long-standing. This factor, accordingly, does not favor according any deferential weight to the agency’s interpretation. See Davis, 495 U.S. at 484, 110 S.Ct. at 2022; Kelley, 17 F.3d at 842 (refusing to give weight to contemporaneous interpretation not in long use); see also Peña, 44 F.3d at 445 (Easterbrook, J., concurring) (long-standing interpretations entitled to more weight only because they shed light on the meaning of the statute when enacted); Richard A. Posner, The Federal Courts: Crisis and Reform 279-80 (1985) (view of current administration, in the absence of long-standing, consistent interpretation, not entitled to weight).
Finally, I turn to the issue of agency expertise. If this case involved any of the issues we typically review under the Medicaid Act, I would be the first to say that the Secretary has developed a tremendous amount of it. That is not the case here, however. Under the Hyde Amendment, funding for abortion, even in cases of rape and incest, was forbidden from 1982 through 1993. Quite simply, abortion of pregnancies caused by rape and incest is not something the agency has had to deal with within recent institutional memory. And it certainly is no expert on the criminology of rape and incest reporting. It therefore lacks any comparative advantage vis-a-vis this court with respect to the issue at hand. I would therefore not accord the agency’s interpretation controlling weight. See Hi-Craft Clothing, 660 F.2d at 915; Mathews, 590 F.2d at 1259; Director, OWCP v. Mangifest, 826 F.2d 1318, 1333-34 (3d Cir.1987) (Weis, J., concurring).
C.
My conclusion is philosophically annealed by the fact that the agency’s letters do not merely regulate a private party; they attempt to preempt a state statute. One of the reasons for Chevron deference is that “federal judges — who have no constituency — have a duty to respect legitimate policy choices made by those who do.” Chevron, 467 U.S. at 866, 104 S.Ct. at 2793. The argument is that agencies, which at least in theory are indirectly responsive to majoritarian pressure, are more legitimate policy makers than Article III courts. With respect to regulation of private party conduct, that theory holds reasonably true; agencies are at least the delegates of the Congress and are often the subordinates of the Executive. It is no secret, however, that what is true in theory may be less so in practice; because of superi- or expertise and “agency capture,” actual agency action may be less majoritarian than *196 we might hope. See Sanford N. Causb-El-lenbogen, Blank Checks: Restoring the Balance of Powers in the Post-Chevron Era, 32 B.C.L.Rev. 757, 814 (1991). Even so, it is reasonable in such circumstances to favor the policy choices of agency heads rather than judges.
That situation shifts considerably, however, in the context of preemption. There, the two alternative policymakers are: (1) unelected and only theoretically accountable bureaucrats on one side of the balance; and (2) the elected state legislators on the other. That is our case, and I think the balance tips sharply in favor of upholding state law, not a federal agency’s interpretation. Under the Supremacy Clause, a federal agency only has the power to preempt when it clearly, conscientiously and lawfully exercises its delegated authority under § 553 of the APA, not when it issues an interpretive rule. Cf. Puerto Rico Dep’t of Consumer Affairs v. Isla Petroleum Corp., 485 U.S. 495, 503, 108 S.Ct. 1350, 1355, 99 L.Ed.2d 582 (1988) (“a clear and manifest [federal] purpose is always required” for preemption); Ray v. Atlantic Richfield Co., 435 U.S. 151, 157, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978) (same).
Indeed, under the law of this circuit, an interpretive rule cannot preempt state law. See United States v. Walter Dunlap & Sons, Inc., 800 F.2d 1232, 1239 (3d Cir.1986) (“Because the regulations on which FmHA relies do not have the force of a congressional directive and because there is no indication that Congress intended an agency regulation to supersede long-standing uniform state law in this area, we decline to accept the government’s position that the regulations control.”). This makes good logical sense, because it takes law to displace law, and an interpretive rule lacks the force of law. Other courts and commentators appear to be in accord. See Koch & Wright, supra, § 3.59, at 73-74 (Supp.1995) (citing South Central Bell Tel. v. Louisiana Pub. Serv. Comm’n, 744 F.2d 1107 (5th Cir.1984), vacated on other grounds, 476 U.S. 1166, 106 S.Ct. 2884, 90 L.Ed.2d 972 (1986); New England Tel. & Tel. Co. v. Public Utilities Comm’n, 742 F.2d 1, 11 (1st Cir.1984), cert. denied, 476 U.S. 1174, 106 S.Ct. 2902, 90 L.Ed.2d 988 (1986)).
IV.
That brings me finally to Pennsylvania’s second physician certification requirement. Unlike the agency’s two letters explaining its interpretation of reporting and certification requirements, here the Secretary promulgated a valid legislative rule with the purported force of law. See 42 C.F.R. § 441.203 (speaking in terms of “a physician”). Her interpretation, therefore, would appear to flow directly from the text of her regulation, merely reminding states of an existing duty.
I do not believe, however, that Congress ever delegated any authority for the Secretary to make such a rule. I recognize that the Secretary has “exceptionally broad authority” to interpret the Medicaid Act itself, Schweiker v. Gray Panthers, 453 U.S. 34, 43, 101 S.Ct. 2633, 2640, 69 L.Ed.2d 460 (1981); see majority at 181, but the Medicaid Act is not at issue here. The statutory text under interpretation is the Hyde Amendment to the appropriations bill that funds the Medicaid program, and there is not one scintilla of evidence in the Hyde Amendment that Congress intended the Secretary to interpret either the scope and extent of her appropriation or the validity of state-imposed second physician certification requirements. Unlike most substantive statutes administered by regulatory agencies, the Hyde Amendment contains no provision enabling the Secretary to make regulations with the force of law. At best, it is silent on the issue. The mere fact of legislative silence, however, does not necessarily imply the existence of a deliberate “gap” in the statute, much less a gap that we must infer Congress intended the Secretary to fill through administrative regulation.[16] Because there was no delegation, the *197 regulation upon which the majority relies is properly treated only as an interpretive rule. See ARAMCO, 499 U.S. at 256-58, 111 S.Ct. at 1235; Gilbert, 429 U.S. at 141-42, 97 S.Ct. at 410-11; Batterton, 648 F.2d at 705.
Applying a Skidmore analysis to 42 C.F.R. § 441.203, it would probably, under normal circumstances, be entitled to controlling weight. The regulation, after all, was enacted soon after the first Hyde Amendment was passed in 1977, and has not changed since. Moreover, because the Hyde Amendment has always permitted funding for Medicaid abortions where the life of the mother would otherwise be endangered, the agency does have considerable expertise in this area. Ordinarily, then, I would agree with the majority that the Secretary’s interpretation is controlling.
As I have already discussed in Part III(C), however, this is a preemption ease, and an interpretive rule cannot preempt state law. Dunlap, 800 F.2d at 1239. Accordingly, I would uphold Pennsylvania’s second physician certification requirement.
V.
Because the majority incorrectly defers under Chevron to the Secretary’s interpretations, and because there is no basis for its holding in the Hyde Amendment itself, I dissent.

. My reasons for doing so are, regrettably for the readers who must digest them whole, somewhat lengthy and involved. As Justice Scalia once said, "Administrative law is not for sissies — so you should lean back, clutch the sides of your chairs, and steel yourselves...." Hon. Antonin Scalia, Judicial Deference- to Administrative Interpretations of Law, 1989 Duke L.J. 511, 511.

. This conclusion is vital to the majority's holding. Under the Administrative Procedure Act, rules may be either legislative or nonlegislative. A legislative rule must be promulgated according to the notice and comment procedures of 5 U.S.C. § 553, which the Secretary did not do in this case. E.g., Beazer E., Inc. v. United States Envtl. Protection Agency, 963 F.2d 603, 606 (3d Cir.1992); Texaco, Inc. v. Federal Power Comm'n, 412 F.2d 740, 742 (3d Cir.1969). Indeed, a legislative rale which is not promulgated in accordance with the requirements of the APA is not entitled to have the force of law. See, e.g., Chrysler Corp. v. Brown, 441 U.S. 281, 302-03, 99 S.Ct. 1705, 1718, 60 L.Ed.2d 208 (1979).

. Accord Shalala v. Guernsey Mem. Hosp., — U.S. —, —, 115 S.Ct. 1232, 1239, 131 L.Ed.2d 106 (1995) (a rule that effects a change in the law is legislative and must comply with APA rulemaking requirements); Beazer E., 963 F.2d at 606 (interpretive rule only reminds parties of existing duties); Texaco, 412 F.2d at 744 (general statements of policy impose no rights or obligations). This distinction is equally true in the case of federal-state cooperative programs, such as Medicaid. See Ohio Dep’t of Human Servs. v. United States Dep’t of Health & Human Servs., 862 F.2d 1228, 1229-30 (6th Cir.1988) (FICFA Medicaid rule not interpretive); Cabais v. Egger, 690 F.2d 234, 238-239 (D.C.Cir.1982) (federal regulation of state-administered program not interpretive).

. See also Ohio Dep't of Human Servs., 862 F.2d at 1234-35 (HCFA Medicaid rule was legislative in character but was treated for deference purposes as interpretive).

. There is some evidence that the law of the circuit has evolved over the fifteen years since Cerro and Mathews. In Limerick Ecology Action, Inc. v. United States Nuclear Regulatory Comm'n, 869 F.2d 719 (3d Cir.1989), we stated that:
The agency's label of an agency action, although one factor to be considered, does not control whether the action is in fact a [legislative] rulemaking. Instead, it is the substance of what the agency has purported to do and has done which is decisive.
Id. at 734 (citation to Cetro and other cases omitted). It is apparent from this language that the Limerick court, like the courts in Dia Navigation and American Mining, took a functional approach to distinguishing legislative from interpretive rules. Nevertheless, there is no evidence in any of our cases, including FLRA (which was heard in banc), that the Cerro-Mathews approach has been overruled.

. The Administrative Conference of the United States adopted Professor Anthony's recommendation. 1992 ACUS 5, 41 Duke L.J. at 1384; see 1 C.F.R. § 305.92-2. Recommendation 92-2 provides that "[a]gencies should not issue state-merits of general applicability that are intended to impose binding substantive standards or obligations upon affected persons without using legislative rulemaking procedures (normally including notice-and-comment).”

. Accord Batterton v. Francis, 432 U.S. 416, 424 & n.9, 97 S.Ct. 2399, 2405-06 & n.9, 53 L.Ed.2d 448 (1977); Morton, 415 U.S. at 237, 94 S.Ct. at 1075; New Jersey, 670 F.2d at 1282; Cerro, 620 F.2d at 980-82; Baker v. Otis Elevator Co., 609 F.2d 686, 692 (3d Cir.1979); Mathews, 590 F.2d at 1258.

. Justice Scalia concurred, opining that the interpretive rule was entitled to Chevron deference and that Gilbert was "an anachronism!.]” Id. at 258-60, 111 S.Ct. at 1236. It is thus clear that the majority held that Chevron was not applicable.

. We give consideration to the agency's interpretation (which many courts refer to as deference), then we decide how much weight the interpretation should receive. To say that we give it "no deference” implies that we do not even consider it, which is not the case.

. Again, it would have been more accurate if the court had said that the interpretation would not be given controlling weight rather than it would be given no deference.

. The overwhelming majority of the other federal courts of appeals has followed essentially the same reasoning. See Kelley v. E.I. DuPont de Nemours & Co., 17 F.3d 836, 841-42 (6th Cir.1994) (policy statements and interpretive rulings not entitled to Chevron deference but are analyzed under Skidmore factors); Motor Vehicle Mfrs. Ass’n v. New York State Dep’t of Envtl. Conservation, 17 F.3d 521, 534-35 (2d Cir.1994) (no Chevron deference to EPA advisory circular); Travelstead v. Derwinski, 978 F.2d 1244, 1250 (Fed.Cir.1992) (interpretive rules receive only Skidmore consideration); Dalheim v. KDFW-TV, 918 F.2d 1220, 1228 (5th Cir.1990) (interpretive rules not binding, relying on Skidmore); Ohio Dep't of Human Servs., 862 F.2d at 1235 (6th Cir.) (according only Skidmore consideration to interpretive rule; thoroughness evident in agency reasoning was "most unimpressive”); Paxton v. Secretary of Health & Human Servs., 856 F.2d 1352, 1356-57 (9th Cir.1988) (interpretive rule not given Chevron deference); St. Luke’s Hosp., 810 F.2d at 331-32 (1st Cir.) (interpretation of even ambiguous statute given only Skidmore consideration); Capitano v. Secretary of Health & Human Servs., 732 F.2d 1066, 1075-76 (2d Cir.1984) (rule treated as interpretive failed Skid-more analysis); Frank Diehl Farms v. Secretary of Labor, 696 F.2d 1325, 1329-30 (11th Cir.1983) (interpretive rules get less deference than legislative rules, citing Skidmore).

. The majority also relies on Hicks v. Cantrell, 803 F.2d 789, 793-94 (4th Cir.1986). There, and with very little analysis, the court held that Chevron deference was owed to an agency interpretation. Because of Hicks’ minimal reasoning and its conflict with the overwhelming majority of courts that have considered the same issue (including the Supreme Court), I simply would not follow it.

. This language is taken from Chevron, 467 U.S. at 843, 104 S.Ct. at 2782, where the Court sets forth step two of the Chevron test. Because Koray is a step one case, I conclude that the use of that quotation amounts to, at most, an “imprecision in the Court's language,” not an implicit part of its holding. See Pope v. East Brunswick Bd. of Educ., 12 F.3d 1244, 1250 (3d Cir.1993).

. The Court quoted Sullivan v. Everhart, 494 U.S. 83, 91-92, 110 S.Ct. 960, 965-66, 108 L.Ed.2d 72 (1990). There, recipients of federal benefits challenged the Secretary's "netting” regulations, which were promulgated as legislative rules. The recipients proffered a plausible construction but the court held — deferring under step two of Chevron — that at most, the recipients proved that the statute could bear their construction, but not that it could not bear the Secretary's construction. That, according to the Court, was insufficient. While the Court's reasoning was certainly applicable to a step two case, Koray and this case arise under Chevron step one, which has a less deferential standard.

.Compare Babbitt v. Sweet Home Chapter of Communities for a Great Oregon, - U.S. -, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995). There, the agency promulgated a proper legislative rule giving further meaning to the statutory term "take” under the Endangered Species Act, 16 U.S.C. § 1531 et seq. While the Supreme Court engaged in an analysis of the text and legislative history of the Act, in the final analysis, it decided that "Congress did not unambiguously manifest its intent” to contradict the agency's view of the statute. The Court accordingly deferred to the "reasonable" interpretation of the agency. - U.S. at-, 115 S.Ct. at 2416-17. Sweet Home, in contrast to Koray, clearly implicated Chevron step two.

. See, e.g., Railway Labor Executives’ Ass’n v. National Mediation Bd., 29 F.3d 655, 671 (D.C.Cir.1994) (en banc) (presuming a delegation would enable agencies to "enjoy virtually limitless hegemony"); West, 879 F.2d at 1138 (Mans-mann, J., concurring and dissenting) (mere silence or ambiguity does not automatically imply delegation to the agency); Weis, supra, at 305 ("If Congress has not clearly delegated a properly circumscribed power, then the agency should *197 not obtain untrammeled discretion through legislative silence.”); Herz, supra at 204 ("Courts should not equate a mere lack of clarity with a delegation of decision-making authority to the agency.”); Cass R. Sunstein, Interpreting Statutes in the Regulatory State, 103 Harv.L.Rev. 405, 445 (1989) (“An ambiguity is simply not a delegation of law-interpreting power.”); Cass R. Sunstein, Constitutionalism After the New Deal, 101 Harv. L.Rev. 421, 467 (1987) (same).