AIR TRANSPORT ASSOCIATION
OF AMERICA, Appellant,

v.

Janet RENO, United States Attorney General and Doris Meissner, Commissioner of the Immigration and Naturalization Service, Appellees.

No. 95–5143.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 29, 1996.

Decided March 26, 1996.

Rehearing and Suggestion for Rehearing In Banc Denied May 24, 1996.

Eric M. Braun, Washington, DC, argued the cause for appellant, with whom Michael S. Sundermeyer was on the briefs.

Darrell C. Valdez, Assistant United States Attorney, argued the cause for appellees, with whom Eric H. Holder, Jr., United States Attorney, and R. Craig Lawrence, Assistant United States Attorney, were on the brief. Rudolph Contreras, Assistant United States Attorney, entered an appearance.

Before: WALD, WILLIAMS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Appellant Air Transport Association of America ("ATA") challenges two policies of the Immigration and Nationalization Service ("INS"). Under the INS's Transit Without Visa ("TWOV") policy, airlines are permitted to allow foreign passengers to board planes bound for the United States even if the passengers do not have United States visas, so long as the passengers are merely connecting to another flight which will take them on to some country other than the United States. Although most of these passengers eventually board their outbound flights and leave the United States without incident, a few, upon arrival in the United States, claim asylum, and under the Refugee Act of 1980 are automatically entitled to remain in the United States until their claim is heard. During the pendency of their asylum requests—which often last more than a year—the INS currently requires the airlines to pay all expenses of detaining these individuals, including hotels, meals, medical services, and round-the-clock guards. In addition, under the INS's "stowaway" policy, the INS requires the carriers to provide similar detention expenses for stowaways who arrive in the United States and claim asylum.

The district court denied summary judgment for the ATA, finding that the INS's policies were authorized by the Immigration and Naturalization Act ("INA"). We disagree, and hold that neither of these policies is authorized by current law. The statutory authority for the INS's TWOV policy—section 233 of the INA—was repealed in 1986, and since that time the INS has had no legal authority to require the carriers to pay detention expenses. Moreover, the statute which the INS cites in support of its stowaway detention policy—section 237 of the INA—only authorizes the INS to require carriers to transport back to their country of origin those stowaways who are excluded and subject to immediate deportation, but does not impose upon airlines any detention responsibility with respect to those stowaways who claim asylum. Although we declare the INS's TWOV and stowaway policies to be unauthorized by law, we find that the ATA lacks standing to seek an order requiring the government to compensate ATA's members for detention expenses they have previously paid, because the determination of such monetary relief would require detailed, individualized proof of the members' damages.

## I. BACKGROUND

### A. Transit Without Visa Policy

Transit without visa passengers are individuals who board airlines in foreign countries with the announced intention of passing through the United States *en route* to another destination. These passengers are permitted, under the INS's TWOV regulations, to enter the U.S. without a passport or visa, provided they are planning "immediate and continuous transit through the United States" to some other country they are entitled to enter, and will depart the U.S. within 8 hours of their arrival (or on the first available transport). *See* 8 C.F.R. §§ 212.1(f)(1); 214.2(c)(1).

Most such passengers proceed through the United States without incident, remaining in special airport areas until their continuing flights depart. Some, however, renounce their intention to merely transit the United States, and assert political asylum as a basis for remaining in the United States. Once they have made a claim for asylum, these aliens are entitled, under the Refugee Act of 1980, Pub.L. No. 96–212, 94 Stat. 102 (1980), to remain in the United States during their asylum hearing process. *See* 8 U.S.C. § 1158 (describing asylum procedure). The INS in turn has required the airlines to pay the detention expenses for these asylum ap-

plicants—including hotel rooms, meals, 24–hour security guards, and medical expenses—during the pendency of the hearing process, which can stretch out to months or even years. *See Aerolineas Argentinas v. United States,* 77 F.3d 1564 (Fed.Cir.1996) (discussing one airline's claim to have spent $162,000 on six passengers and another airline's claim to have spent $89,000 on a single passenger); 59 Fed.Reg. 14,779, 14,780 (1994) ("most asylum applicants wait a year or more to receive even initial decisions on their cases").

Prior to 1986, the INS had based its requirement that the airlines bear these detention expenses principally on section 233 of the INA, which in relevant part provided:

(a) Upon the arrival at a port of the United States of any vessel or aircraft bringing aliens ... the immigration officers may order a temporary removal of such aliens for examination and inspection.... A temporary removal of aliens from such vessels or aircraft ... shall be made by an immigration officer at the expense of the vessels or aircraft or transportation lines....

(b) Whenever a temporary removal of aliens is made under this section, the vessels or aircraft ... shall pay all expenses of such removal to a designated place for examination and inspection ... and all expenses arising during subsequent detention, pending a decision on the aliens' eligibility to enter the United States....

8 U.S.C. § 1223 (1970), *repealed by* Pub.L. No. 99–500, 100 Stat. 1783–56 (1986).

While section 233 provided the underlying authority for requiring airlines to pay detention expenses, implementation of this policy was governed by section 238 of the INA:

The Attorney General shall have power to enter into contracts including bonding agreements with transportation lines to guarantee the passage through the United States in immediate and continuous transit of aliens destined to foreign countries. Notwithstanding any other provision of this chapter, such aliens may not have their classification changed under section 1258 of this title.

8 U.S.C. § 1228(c) (Supp.1995) (formerly 8 U.S.C. § 1228(d) (1970)). The INS developed a standard contract with the airlines, known as "Form I–426" under which it has required the airlines to pay these detention expenses as well as liquidated damages in the event the airline fails to transport an alien out of the country. Although the airlines are theoretically free not to sign these contracts, if they do not, then they will not be allowed to accept TWOV passengers aboard their planes. Not surprisingly, most major airlines have signed I–426 agreements. *See* 8 C.F.R. § 238.3 (listing signatories).

In 1986, however, Congress repealed section 233,[1] and also passed the Immigration User Fee Statute ("IUFS"), Pub.L. No. 99–591, § 205, 100 Stat. 3341–53 (1986) (codified as amended at INA § 286, 8 U.S.C. § 1356). The IUFS established a separate "User Fee Account" to be funded by a $5 surcharge (now $6) on international tickets. *See* 8 U.S.C. § 1356(d)(h). That money was to be deposited in a separate account, from which:

The Secretary of the Treasury shall refund out of the Immigration User Fee Account to any appropriation the amount paid out of such appropriation for expenses incurred by the Attorney General in providing immigration inspection and preinspec-

---

1. Congress' concern with the INS's detention expense policy can be traced back to 1985, when the House Appropriations Committee noted its concern

about the policy of the Immigration and Naturalization Service which requires scheduled passenger airlines to assume custody and financial responsibility for aliens who arrive by plane in the United States without proper documentation. The Committee understands that in the absence of Government detention facilities, air carriers must detain such aliens in custody and in all cases pay for their food and

shelter. The Committee believes this policy raises significant questions about the equity and legal propriety of requiring private entities to assume the financial burdens of maintaining and, at times, exercising physical custody over excluded aliens for extended periods of time. Specifically, the Committee is concerned about the possible ramifications of detention of aliens by airline personnel or their agents who are not, of course, law enforcement officials.

H.R.Rep. No 197, 99th Cong., 1st Sess., at 38 (1985).

tion services for commercial aircraft or vessels and in—

(i) providing overtime immigration inspection services . . .

(ii) administration of debt recovery . . .

(iii) expansion . . . of information systems . . .

(iv) detection of fraudulent documents used by passengers traveling to the United States; and

(v) *providing detention and deportation services for excludable aliens arriving on commercial aircraft and vessels.*

8 U.S.C. § 1356(h)(2)(A) (emphasis supplied).

In response to the 1986 Amendments, the INS issued new regulations, 50 Fed.Reg. 100 *et seq.* (1989), acknowledging that the IUFS required the INS "to address the change from carrier responsibility to [INS] responsibility for the custody and detention of excludable aliens." While accepting responsibility for the detention of most excludable aliens, the INS has continued to insist, however, that "carriers are responsible for the detention expenses of detained TWOV passengers while in Service custody. . . ." *Id.* at 101. According to INS, "[a]lthough the issue of carrier responsibility for TWOV passengers may be a thorny one," section 238 of the INA (governing bonding agreements) provides the necessary authority for the INS to enter into enforceable Form I–426 contracts. *Id.*

Thus even after the repeal of section 233, the INS has continued to require the airlines to pay detention expenses for TWOV passengers who renounce their TWOV status and apply for asylum.

## B. *Stowaway Policy*

The INS also requires the airlines to pay the detention expenses for stowaways who apply for asylum, basing this policy on section 237 of the INA:

Any alien . . . arriving in the United States *who is excluded* under this chapter, shall be immediately deported, in accommodations of the same class in which he arrived. . . . The cost of the maintenance including detention expenses and expenses incident to detention of any such alien while he is being detained shall be borne by the owner or owners of the vessel or aircraft on which he arrived.

8 U.S.C. § 1227(a)(1) (emphasis supplied). The INA does not define the term "stowaway," but provides only that "[a]ny alien who is a stowaway is excludable." 8 U.S.C. § 1182(a)(6)(D). However, through a series of directives, the INS has applied section 237 not only to those individuals who have boarded airlines without tickets, but also to individuals who arrive without proper documentation and whom the airlines cannot prove had proper documents when they boarded. Consequently, the airlines are potentially liable for the detention expenses of individuals who board properly, but then destroy their travel documents *en route,* thus converting themselves into "stowaways."

Prior to 1980, all stowaways were excluded from the United States and subject to immediate deportation. During that time, it was not disputed that under section 237, the airlines had responsibility for returning these stowaways to the country from which they had arrived, and were required to bear any detention expenses incurred before the stowaways' return travel could be arranged. Even today the airlines do not dispute their liability under section 237 for promptly returning stowaways who are not seeking asylum. However, they do dispute their liability for detaining those stowaways who claim asylum. These aliens, since the enactment of the Refugee Act of 1980, are permitted to remain in the United States pending consideration of their asylum claims, *see* 8 U.S.C. § 1253(h)(1), but the INS has continued to classify them as "excluded" rather than "excludable," and to require the airlines to bear their detention expenses.

## C. *District Court Proceedings*

The ATA brought suit challenging both the INS's TWOV detention policy and its stowaway detention policy. The district court denied ATA's motion for summary judgment, finding that the language of the IUFS did not clearly establish that Congress intended for the INS to bear the detention costs of aliens who applied for asylum. The court

found persuasive the government's argument that section 238 provides the INS with the legal authority to enter into enforceable contracts with the airlines under which the airlines can be held responsible for the detention expenses of all TWOVs, regardless of whether they abandon their announced travel plans and instead seek asylum in the United States. In addition, the court concluded that stowaways are "excluded" rather than "excludable" aliens, and thus the INS has authority to require the airlines to bear their detention expenses under section 237. There are no disputed facts, and we review the district court's legal conclusions *de novo*.

## II. DISCUSSION

### A. *TWOV Policy*

■ The first question is whether the relevant portion of the INA which survived the 1986 Amendments—section 238—provides an adequate basis for the INS's TWOV detention policy. We conclude, along with two of our sister circuits, that it does not. *See Aerolineas Argentinas v. United States*, 77 F.3d 1564 (Fed.Cir.1996); *Linea Area Nacional De Chile v. Meissner*, 65 F.3d 1034 (2d Cir.1995) ("*LAN Chile*"). In light of the well-reasoned discussions of identical issues in these recent opinions, we will be brief.

Put simply, it is clear to this court that the repeal of section 233—which had previously supported the INS's TWOV detention policy—left the INS without a statutory leg to stand on in its attempts to charge the airlines for detention expenses for aliens pending

their asylum determinations by the INS. Section 233 had indeed required the carriers to pay "all expenses arising during subsequent detention," if aliens failed to immediately depart the United States, and had been specifically identified by the INS as the source of its authority for imposing these costs on the airlines. *See Hearings on Commerce, Justice, State and Related Agencies Appropriation for 1986 Before House Subcomm. on Appropriations*, 99th Cong., 1st Sess. 1230–32 (1985). In the absence of section 233, we find no basis in law for the INS's TWOV detention policy.[2]

The INS argues that notwithstanding the repeal of section 233, Congress evinced its intention to allow the TWOV policy to continue by leaving intact section 238, which authorizes the INS to enter into "bonding agreements" with the airlines. But section 238 cannot support the weight the INS would lay upon it. The contracts or bonding agreements authorized under that section are only for the purpose of "guarantee[ing] the passage through the United States in *immediate and continuous transit* of aliens destined to foreign countries," 8 U.S.C. § 1228(c) (emphasis supplied), not for the purpose of guaranteeing the payment of detention expenses while an asylum application is pending.[3] In response, the INS argues that if section 238 does not permit it to shift detention costs to the airlines, the section would be rendered a "nullity." Brief for Appellee at 11. We, however, agree with the Second Circuit's rejection of that argument in *LAN Chile:*

> that not only had INS represented at times that it relied solely on section 233 to support its detention policy, but that it made such representations to *Congress*, thus presumably inducing Congress to repeal section 233 in order to take this authority away from the INS. *See id.* (quoting INS statements to Congress).

---

**2.** The INS argues on appeal that its detention policy has all along been based not only on section 233 but also on section 238, 8 U.S.C. § 1228(c). Addressing this precise question, the Second Circuit concluded:

> We also reject INS's contention that it historically has relied not only on repealed § 1233 [section 233] for the power to require carriers to assume the burden of detaining TWOVs who petition for asylum, but also on unscathed § 1228(c).... We think it plain that the invocation of former section 238 sets forth INS's unchallenged general power to contract, and not its controverted power to compel the carriers to detain the subset of TWOVs who petition for asylum. Further the record is rife with instances in which INS has cited solely § 1223 in support of its actions.

*LAN Chile*, 65 F.3d at 1041. Our own examination of the legislative history leads us to agree

**3.** The INS argues that "the plain meaning of 'bonding agreement' includes a requirement that one party acts as a bail or surety to ensure that the United States will not have to incur the expenses caused by a breach of the airlines promise." Brief for INS at 9. While that may be so, it is not clear to us just what promise the airlines have breached when the very party they contracted with—the United States—is the one preventing the immediate departure of the alien.

We believe that Congress left § 1228(c) [section 238] untouched in 1986 because that section provides the necessary statutory authority to allow the Commissioner to require common carriers to maintain responsibility for TWOV's during the relatively brief period of a routine layover. Had § 1228(c) been repealed, no provision would allow the INS to place that burden upon the airlines. As a matter of statutory construction, however, § 1228(c) cannot authorize the Commissioner [of the INS] to enter into contracts that exceed the bounds of the authority granted her.

65 F.3d at 1040. Thus the INS is still free, under section 238, to enter into bonding agreements with airlines, and to penalize the airlines if they fail to ensure that TWOV passengers (other than those seeking asylum) remain in the proper areas of the airport, and board their outbound flights.

■ Finally, although our conclusion that the INS's TWOV detention policy is *ultra vires* is bolstered by the enactment of the User Fee Statute, we are not as confident as our sister circuits that the IUFS *by itself* stripped the INS of its authority to require the airlines to bear TWOV detention expenses. *Cf. Aerolineas Argentinas*, 77 F.3d at 1570; *LAN Chile*, 65 F.3d at 1041 (both finding that IUFS required INS to assume detention responsibility). While the IUFS provides a fund for the payment of expenses the INS has incurred in detaining excludable aliens, it does not expressly *require* the INS to assume responsibility for such detention.[4] Most certainly, the IUFS was a part of an overall congressional plan to shift the burden of detention of excludable aliens to the INS, but in our view, it was the repeal of section 233 which decisively established that the INS has no authority to require carriers to bear the detention expenses for TWOV passengers who claim asylum.

B. *Stowaway Policy*

■ The statute cited by the INS to justify its stowaway policy—section 237 of the INA—applies only if the alien in question is "excluded under this chapter." 8 U.S.C. § 1227(a)(1). The nub of the dispute here is whether stowaways who apply for asylum are aliens "excluded under this chapter" (as the INS insists), or whether they are "excludable" (as ATA insists). We conclude that stowaways who apply for asylum are excludable, not excluded, and thus the carriers cannot be held liable for their detention expenses.

As the INS's own regulations suggest, there is a difference between excludable and excluded aliens, in that the latter are subject to immediate deportation. *See* 8 C.F.R. § 235.3(e):

> [The INS may notify an airline] that the alien passenger may be excludable from the United States and in the event the alien is ordered formally excluded and deported, the carrier will be responsible for detention and transportation expenses to the last foreign port of embarkation provided in § 237.5 of this chapter.

Moreover, the language of the INA supports this conclusion, saying that "Any alien who is a stowaway is *excludable*." 8 U.S.C. § 1182(a)(6)(D) (emphasis supplied). It is true, as the district court pointed out, that stowaways have historically been "disfavored" and that a snippet of legislative history from 1952 suggests that "[s]towaways are excluded absolutely." H.R.Rep. No. 1365, 82d Cong., 2d Sess. (1952), *reprinted in* 1952 U.S.C.C.A.N. 1653, 1703. But the fact that stowaways have been disfavored does not transform them into "excluded" aliens. Moreover, the single statement from the 1952 report on which the INS relies was made *before* the 1980 Refugee Act allowing stowaways to remain in the United States to assert an asylum claim. Consequently, we conclude, as did the Federal Circuit, that "after the Refugee Act of 1980 provided that stowaways may apply for political asylum, they were properly considered 'excludable' rather than 'excluded.' " *Aerolineas Argentinas*, 77 F.3d at 1577. Consequently, the INS lacks the statutory authority to require

---

4. We do note that the INS in its own regulations acknowledged that the IUFS contemplated shifting detention responsibility for excludable aliens to the INS, yet it nonetheless carved out an exception for TWOVs from that general shift.

carriers to pay their detention expenses while their asylum claims are pending.[5]

### C. *Remedy*

■ The ATA seeks an exceedingly broad remedy here: not only does it wish this court to declare the INS's TWOV and stowaway detention policies illegal, but it also requests an order allowing its members to make individualized showings of damages and receive compensation for amounts they have expended for the detention of TWOVs and stowaways since 1986, when the IUFS was enacted. Although we grant the ATA the declaratory relief it seeks, we find that it lacks standing to seek an order requiring the INS to reimburse its members for detention expenses they have unnecessarily incurred since 1986.

The starting point for our analysis is *Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), in which the Supreme Court summarized the three requirements an organization must meet in order to have standing to bring suit on behalf of its members:

> (a) it members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Id.* at 343. While the ATA meets all three of these requirements with respect to its request for declaratory relief, we find that any award of monetary compensation would "require[ ] the participation of individual members in the lawsuit," and thus that ATA lacks standing to seek such relief.[6]

The situation here is similar to that in *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), in which the Supreme Court held that an association of construction firms lacked standing to seek damages for profits and business lost by its members because of a town's zoning ordinances. Reviewing previous cases in which associations had been granted standing, the Court noted that in all such cases the association had sought a "declaration, injunction or some other form of prospective relief," where "it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Id.* at 515, 95 S.Ct. at 2213. In the case before it, however, the Court found that the

> Association seeks relief in damages for alleged injuries to its members. Home Builders [the association] alleges no monetary injury to itself, nor any assignment of the damages claims of its members. No award therefore can be made to the association as such. Moreover, in the circumstances of this case, the damages claims are not common to the entire membership, nor shared by all in equal degree. To the contrary, whatever injury may have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof. Thus, to obtain relief in damages, each member of Home Builders who claims injury as a result of respondents' practices must be a party to the suit, and Home Builders has no standing to claim damages on his behalf.

*Id.* at 515–16, 95 S.Ct. at 2213–14. That reasoning is equally applicable here. While it can fairly be said that declaratory relief will inure to the benefit of ATA's members, the "damages claims are not common to the entire membership, nor shared by all in equal degree," and consequently there is simply no way the extent of the harm to the ATA's members can be determined without "individualized proof." *See Telecommunications Research v. Allnet Communication Servs.*, 806 F.2d 1093 (D.C.Cir.1986) (associa-

---

5. In light of our disposition of this matter, we do not reach the contention raised by the ATA that the INS's directives implementing its stowaway policy were legislative rules improperly promulgated without the notice and comment required by the Administrative Procedure Act ("APA"). *Cf. Dia Navigation Co. v. Pomeroy*, 34 F.3d 1255, 1263–66 (3d Cir.1994) (finding the INS's regula-

tions were legislative in nature, and thus subject to APA's notice and comment procedure).

6. The ATA does not claim that it has suffered any harm to itself as *an association*, and thus would qualify for organizational standing, but instead seeks relief only on behalf of its members—a claim of representational standing.

tion did not have standing to seek money damages on behalf of its members).

In response, the ATA argues that this court and the Supreme Court have "previously granted associations the precise type of monetary relief that ATA seeks." Reply Brief for ATA at 17. The leading case cited by the ATA, however, did *not* involve the precise question we have here. In *International Union, United Auto. Aerospace & Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986), a union sought a declaration that the Secretary of Labor had improperly caused state agencies to deny union members certain trade readjustment benefits. Although the injunctive relief sought by the union would ultimately have resulted in the payment of these benefits to union members, the Supreme Court found that the third prong of the *Hunt* test had been met: "The suit raises a pure question of law: whether the Secretary properly interpreted the Trade Act's TRA eligibility provisions." *Id.* at 287, 106 S.Ct. at 2531. Once the Court granted the injunction, the Supreme Court said, it would then be up to the *individual state agencies* to calculate the amount the union members were entitled to. *Id.* at 288, 106 S.Ct. at 2531. Because there were separate entities vested with authority to assess individualized claims and ready and able to do so once the obstruction posed by the defendant agency's error of law was remedied, the matter could be *judicially* disposed of without the individual participation of union members.[7]

In this case, however, a judicial declaration that the INS's policies are invalid would not end the matter. The determination of how much money the airlines paid, for what kinds of detention services, and for which types of aliens, would be no simple administrative matter, but would instead require detailed and individualized proof from each airline. The money that the airlines have paid is not in the hands of the INS, but rather was paid out to myriad hotels, restaurants, doctors and security firms, as far back as ten years ago. While we acknowledge that a request for monetary relief by an association does not *absolutely* preclude standing in all cases, the question in each case is whether the monetary relief can be awarded without "individualized proof." Under the circumstances of this case, we find that individualized proof would definitely be required, and thus we find that the ATA lacks standing to obtain monetary relief.[8] *See Self–Insurance Inst. of Am. v. Korioth*, 53 F.3d 694, 696 (5th Cir.1995) (association challenging tax had standing to seek injunctive relief but could not obtain refunds, because of need to determine individual refund eligibility and amount); *United Union of Roofers, Waterproofers & Allied Trades No. 40 v. Insurance Corp. of Am.*, 919 F.2d 1398, 1400 (9th Cir. 1990) (union challenging underpayment of wages did not meet third prong of *Hunt* test because the "claims for monetary relief necessarily involve individualized proof"); *Terre Du Lac Ass'n, Inc. v. Terre Du Lac, Inc.*, 772 F.2d 467, 470–71 (8th Cir.1985) (association lacked standing to obtain monetary relief for violations of Land Sales Act because of the need for individualized proof concerning the circumstances under which each of its members purchased the land in question), *cert. denied*, 475 U.S. 1082, 106 S.Ct. 1460, 89 L.Ed.2d 718 (1986); *Simer v. Rios*, 661 F.2d 655, 682 & n. 57 (7th Cir.1981) (organization

---

**7.** In the other case cited by ATA, *Beverly Hospital v. Bowen*, 872 F.2d 483 (D.C.Cir.1989), not only did the associations bring suit, but several individual hospitals joined them in challenging HHS's interpretation of certain Medicare regulations. We granted the plaintiffs in *Beverly Hospital* the reimbursement for photocopying expenses that they were already entitled to by statute. We did not, however, address the question of organizational standing.

**8.** In this regard our case is distinguishable from *LAN Chile*, in which the Second Circuit held that an *individual airline* could seek monetary compensation arising out of the INS's illegal policies.

*Id.*, 65 F.3d at 1042–44. In *LAN Chile*, the court found that the United States had waived sovereign immunity for the monetary relief the plaintiff was seeking—an issue we do not reach here. Even if sovereign immunity bars an action for monetary damages in the district court, the Federal Circuit has held that individual airlines may seek monetary relief under the Tucker Act, 28 U.S.C. § 1491(a)(1), in the Court of Federal Claims. *See Aerolineas Argentinas*, 77 F.3d at 1575 ("We conclude that the Tucker Act provides jurisdiction to recover the sums exacted illegally by the Service due to its misinterpretation or misapplication of statutes, regulations, or forms ... [a]fter 1986....").

lacked standing to challenge failure to provide heating assistance because "individualized proof" would be required as to whether individuals had in fact been discouraged from seeking such assistance), *cert. denied,* 456 U.S. 917, 102 S.Ct. 1773, 72 L.Ed.2d 177 (1982).

### III. CONCLUSION

The INS's policies of requiring carriers to bear the detention costs of TWOVs and stowaways who seek asylum not only lack a basis in law, but reflect a position "hardly worthy of our great government." *Brandt v. Hickel,* 427 F.2d 53, 57 (9th Cir.1970). When TWOV passengers or stowaways seek asylum in the United States, carriers cannot be required, by regulation, contract, or otherwise, to bear the detention expenses during the pendency of their asylum applications in the absence of a statute imposing such a duty on them. We conclude, however, that the ATA lacks standing to seek monetary relief on behalf of its members. Accordingly, the judgment of the district court is reversed, and the case is remanded for the district court to enter summary judgment in favor of the ATA.

*So ordered.*